THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOHN DIOGUARDI and JOHN J. MCNAMARA, Appellants.

First Department, June 23, 1959.

*William W. Kleinman* of counsel (*Eugene Gold* and *Solomon A. Klein* with him on the brief), for John Dioguardi, appellant.

*Arthur Karger* of counsel (*Herman L. Weisman* with him on the brief; *Amen, Weisman & Butler,* attorneys), for John J. McNamara, appellant.

*Richard G. Denzer* of counsel (*H. Richard Uviller* with him on the brief; *Frank S. Hogan, District Attorney*), for respondent.

M. M. FRANK, J.  The defendants appeal from judgments convicting them of the crimes of conspiracy and extortion.

The indictment contains two counts:  the first charges conspiracy to commit the crime of extortion (Penal Law, § 580); the second charges extortion (Penal Law, §§ 850, 851, subd. 1). The latter count alleges that between January 23 and July 17, 1956, the defendants wrongfully, unlawfully and corruptly obtained the sum of $4,700, the property of Tower-Crossman Corporation and Atlas Stationery Corporation (hereinafter referred to as Tower and Atlas), from Anthony J. Kerin, Sr., Anthony J. Kerin, Jr. and Jack G. Schuman, officers thereof, "with their consent by the wrongful use of fear, induced by threats of the defendants to do an unlawful injury to the property of said corporations  *  *  *.' '

The operative facts are largely undisputed.  The two corporations functioned generally as one unit from the same offices, and were unquestionably dominated and controlled by Kerin, Sr.  Prior to November, 1955, the employees were unorganized and unaffiliated with any labor union.  During that month, a Mr. Freeman, representing the Retail Clerks' Local No. 585, CIO, communicated with the complainants for the purpose of organizing the employees, without definite result.  Shortly thereafter, two men, Beshlian and De Lange, on behalf of Local 210 of the AFL Teamsters' Union, informed the complainants that their local intended to unionize the employees.  Mr. Kerin, Sr. became alarmed at these activities, not only because he had been advised that the organizational efforts might lead to picketing and possibly to a strike, but because he was unimpressed with the labor representatives who had made these approaches. He consulted his lawyers, but they could give him no ready assurances of relief from labor trouble.  However, they arranged for him to meet an officer of a concern in the same line of business and through that person he was introduced to one Lafayette, an official of Local 1601, Retail Clerks' Union.  Kerin urged

Lafayette to arrange for the employees of Atlas and Tower to join that local. At one point in the conferences, he offered Lafayette a present or a gratuity, which was refused. However, Kerin requested and received a predated letter from Lafayette, to enable him to assert that he was negotiating with a union, in the event that officials of other labor unions communicated with him. Kerin received assurances from Lafayette that an organizer would be sent to the offices of Atlas and Tower with membership blanks to enlist the employees into Local 1601.

On January 16, 1956, without prior notice, pickets appeared at one of the entrances of the corporate offices carrying signs that read: '' This employer, Tower & Crossman Corporation, is unfair to members of International Brotherhood of Teamsters, Local 138, affiliated with the A. F. of L., 23–03 45th Road, Long Island City, New York, Telephone Ex 2-2300.'' Local 138 was thus the fourth labor group that sought to unionize Kerin's business, although that local had made no initial contact before that date. As a result of the picketing by Local 138, some truck drivers refused to cross the picket line.

Now thoroughly alarmed, Mr. Kerin was advised by Mr. Coogan, one of his lawyers, that no immediate stay of the picketing could be obtained from the courts or the Labor Relations Board. It was suggested that Mr. White, a labor law specialist, might be of assistance.

Mr. White's services were engaged and, with the approval of Kerin and Coogan, he consulted several labor leaders, including the defendant McNamara. At a meeting with him, Coogan and White, without disclosing the names of their clients, outlined the difficulties, and sought McNamara's help by requesting that he arrange for the employees to join Local 295 of the Teamsters' Union, of which he was an officer. A discussion took place as to whether the other labor unions could be induced to consent to an immediate election, but when they were identified to McNamara, he expressed doubts that those locals would withdraw or consent to an immediate poll. In a private conversation between them, McNamara told Coogan that he thought he could arrange to have the employees inducted into his local and the pickets withdrawn, but that it would cost between five and ten thousand dollars.

Coogan reported his conversation with McNamara to the senior partner of his law firm, and it was decided that the firm would no longer participate in any negotiations with McNamara. However, they did advise Kerin of the talks and suggested that, if he desired, he might personally meet with McNamara. It was Coogan's opinion that if Kerin talked with McNamara, '' a plan

could be worked out where the pickets would be removed and we would have no labor trouble ''.

An appointment was arranged, and on Friday, January 20, 1956, Mr. Kerin, Sr., his son and Mr. Schuman took lunch with McNamara and one Holt at a private club. Mr. Kerin detailed the various benefits that he had provided for his employees, voiced his concern about the problem confronting him and sought McNamara's co-operation and assistance. McNamara indicated that he thought an acceptable program could be arranged. Kerin, Sr., and McNamara then left the others and went to another room, where they privately discussed the terms of a labor contract. It was there that McNamara informed Kerin that it would be necessary for the corporations to engage Equitable Research Associates as their labor consultant, at a monthly retainer of $100 for each company. In addition, an immediate payment to Equitable of $3,500 would be required, to reimburse the various locals for the expenses incurred in their efforts to organize Tower and Atlas. Mr. Kerin agreed to the terms suggested. When McNamara and Kerin rejoined the others, the latter outlined the plan to his son and Schuman and informed them that he had accepted it. McNamara was asked whether the arrangement would accomplish the immediate withdrawal of the pickets and he responded that it would. On January 23, 1956, the complainants ascertained and observed that the pickets were gone and Kerin instructed Schuman to issue checks to Equitable. That same day McNamara appeared at the corporate offices and picked up the checks, one for $2,000 from Tower and the other for $1,500 from Atlas, simultaneously presenting for signature a letter contract of retainer from Equitable Research Associates already signed by its president, the defendant John Dioguardi. The Equitable contract was not executed by the complainants at that time, but was forwarded to Mr. Coogan, who redrafted it. It was then signed on behalf of Atlas and Tower, and delivered to McNamara who obtained Dioguardi's signature thereon and returned it to the complainants. At Kerin's request no union contract was consummated with McNamara at that time, because Kerin was about to take a trip abroad. Later, after some negotiation an agreement was signed on June 12, 1956.

No complaint about any part of the entire transaction was ever made by Kerin or any other officer of Atlas or Tower. The payments of $200 monthly to Equitable were made regularly. The arrangement came to the attention of the District Attorney when Equitable's books were seized and the officers of Atlas

and Tower were interrogated during the course of an investigation into Dioguardi's affairs. Although the payments were discontinued at the suggestion of the Assistant District Attorney in charge of the investigation, nevertheless the sum of $200 each month was segregated by the corporations for eventual payment to Equitable.

During this period, none of the complainants met the defendant Dioguardi nor were they aware that he was the same person who had been widely publicized as " Johnny Dio ". It was not until some months later, when they learned from newspaper items that Dioguardi was " Johnny Dio ", that they suggested it might be advisable to meet with him. By arrangement, Mr. Schuman met Dioguardi at the offices of Equitable Research Associates and a brief conversation ensued. Schuman testified, " I said that we were pleased with the arrangement that had been made and the way it had worked out; that the picket line was no longer there; we no longer had organizers at our door; and that we had had no further problems. And Mr. Dioguardi said, in substance, that that is the way it should be."

While, in his opening statement, the prosecutor asserted that McNamara conveyed an unlawful threat to injure the business of Tower and Atlas unless the money was paid, at the close of the case, the prosecution theory shifted to one in which the charge of extortion was predicated upon the contention that the defendants seized upon the pre-existing fear of the corporate officers in order to obtain money or property belonging to the corporation.

On the state of the evidence, the prosecutor properly conceded in his summation that there was no proof that either defendant had anything to do with the efforts made by any of the four unions, which caused Kerin to be gravely concerned about the future of his business and led him to seek out McNamara. Moreover, he cautioned the jury that " there is no proof, there is no circumstance from which you can draw the inference that McNamara or Dioguardi placed the picket line there."

The nub of the question, therefore, is whether the crime of extortion can be committed by one who does not himself induce the fear that actuates the payment of money, but who, because of a pre-existing fear, independently instilled by others, not accomplices or co-conspirators, receives money for the purpose of removing or allaying that fear.

Time and again during the trial, Kerin made it clear, as he stated he had before the Grand Jury, that McNamara instilled no fear in him. The fear of damage to his enterprises by unwel-

come labor activities antedated McNamara's entry on the scene, and Kerin looked to him to be relieved of his troubles.

There was not the slightest suggestion at the trial of any threat made by McNamara, that if the arrangement he proposed was not consummated, he would cause a continuation of the picketing, or that either defendant would interfere with the business. While it is true that fear may be instilled and threats made in soft language or subtly couched phrases, that was not the situation here. The relationship between Kerin and McNamara was cordial and friendly. Kerin had sought out McNamara and after they agreed upon terms, Kerin showed his appreciation by presenting McNamara with gifts that he brought from Europe.

While there was no proof as to the time when the defendant Dioguardi became a participant in McNamara's activities, it is indisputable from the record that it was after his codefendant's first meeting with Coogan and White.

It was urged at the trial that if criminally responsible at all for any of the acts with which they were charged, the defendants were guilty of subdivision 2 of section 380 of the Penal Law (solicitation and acceptance of a bribe by a labor representative). Upon the proof in the record, that is undoubtedly correct, but we are not concerned with it. Since the defendants were not indicted or tried for that crime, we are not required to pass on that issue. Parenthetically, it may be noted that the Legislature, at its last session, amended the section (Penal Law, § 380, as amd. by L. 1959, ch. 609) to convert the misdemeanor to a felony, probably for the purpose of eliminating the difficulties of proof to sustain a charge of extortion. However, if the defendants were guilty of bribery, pursuant to the statute, they could not be guilty of extortion, for the two crimes are mutually exclusive (*People* v. *Feld,* 262 App. Div. 909).

Extortion is not a new crime. Especially as it deals with property obtained under color of official right, its genesis in the common law occurred several centuries ago, and Blackstone specifically mentioned it in his Commentaries. It developed as an extension of robbery (*People* v. *Griffin,* 2 Barb. 427; *People* v. *Barondess,* 61 Hun 571, 575). Extortion, as alleged here, was added to the old Penal Code at least as early as 1881. Its commission depends upon several essential factors. There must be the obtaining of property from another, with his consent, and the delivery of the property must be induced by force or fear. The fear so induced must result from threats made to accomplish that purpose. Thus, while we deal with an indictable

offense of long standing and though it has been enforced in innumerable cases, out attention has not been directed to a single reported case in which a conviction was sustained where the threat was made and the fear instilled, as here, by persons not proven to be *in particeps criminis* with the recipient of the property. Of course, that is not to say that extortion is not committed when a new fear is imposed upon an old or pre-existing one.

The prosecution contended and the court charged that the crime was complete if the defendants " seized upon the opportunity created by the existence of " an independent antedating misfortune to demand personal tribute. In reliance upon this theory our attention is directed to several cases in other jurisdictions (*United States* v. *Varlack*, 225 F. 2d 665, 668; *People* v. *Hopkins*, 105 Cal. App. 2d 708; *Commonwealth* v. *Neubauer*, 142 Pa. Superior Ct. 528; *Callanan* v. *United States*, 223 F. 2d 171, cert. denied 350 U. S. 862). None of the cited cases presents a situation in which the defendant was a stranger to the inducing fear.

It should be noted that the indictment specifically charges that money was obtained from the complainants " by the wrongful use of fear, induced by threats of the defendants to do an unlawful injury to the property of the said corporations ". Therefore, to sustain the conviction, the proof should have established that fear was induced by threats made by the defendants, as alleged in the indictment. However, Mr. Kerin, Sr., the dominant individual in the corporations involved, testified repeatedly throughout the trial that his relationship with McNamara was cordial and friendly; that McNamara was always a gentleman; that he liked the way he did business; and that he had no fault to find with the agreement he had made with him. Moreover, regarding the contract with Equitable signed by the defendant Dioguardi, Kerin unequivocally stated that he believed he had entered into a perfectly legal transaction, and " that our attorney had prepared this arrangement for us; that our attorney had the opportunity of telling me, ' Mr. Kerin, don't go through with this and go down and see the District Attorney '; and if he had done that, I never would have signed this contract ".

Mr. Kerin, Sr., his son and Shuman, all testified, in effect, that what they feared was that the labor difficulties confronting them and the picketing which ensued would injure their business. However, there was not a scintilla of proof that the defendants were the inducing cause of that fear, or connected in any way with the incidents creating the condition from which the fear emanated.

The record makes it clear beyond cavil, that Kerin sought out McNamara and importuned him for assistance. Nor is there the slightest suggestion that McNamara expressly or impliedly threatened to take any action detrimental to Atlas or Tower, if his proposal was not adopted by the complainants. The only conclusion most favorable to the prosecution, that may be drawn from the evidence, is that McNamara would not intervene to assist Kerin in overcoming the labor difficulties in which the corporations were embroiled, unless his proposals were accepted. McNamara was under no obligation or duty to take such affirmative action and his failure to do so can scarcely be termed a threat or an extorsive act. If it were otherwise, every response to a request for assistance in return for a monetary payment would constitute the crime of extortion.

It is, of course, important to consider Kerin's state of mind. As hereinbefore indicated, the record is clear that the defendants made no threats and there was no fear instilled in Kerin and his associates attributable to them. In that connection, Kerin's offer, before McNamara came on the scene, of a present or gratuity to Lafayette to induce him to organize the Tower and Atlas employees is an unmistakable indication of complainant's state of mind. Not alone does it point to the absence of any extorsive conduct on the part of the defendants but it warrants the reasonable conclusion that Kerin eagerly sought help in obtaining a favorable contract from a friendly union, for which he was willing, if not anxious, to pay.

By way of analogy, the gravamen of the Federal Anti-Racketeering Act is extortion (U. S. Code, tit. 18, § 19–51) defined almost identically with the section here involved. In *Nick* v. *United States* (122 F. 2d 660, 671, cert. denied 314 U. S. 687), the Circuit Court said, "The gist of the unlawful act is extortion. Extortion involves a state of mind as an element of an offense under the Act. Unless there is some form of compulsion (either physical or fear) there is no crime under this Act. If the exhibitors paid this money of their own initiative and voluntarily there would have been no violation of the Act. It was, therefore, essential to show that such payment was under such compulsion."

*People* v. *Gardner* (144 N. Y. 119, 124) assists in clarifying the point. In that case the defendant was convicted of attempted extortion. It appears that he obtained money from the complainant, a brothel keeper, upon a representation that if she paid it, he would not accuse her of crime. It was not disputed that the complainant was not put in fear by the defendant at any time, for in negotiating with him she was acting under

instructions from the police. While the case involved problems with which we are not concerned, the question of the defendant's threats as inducing fear is important here. The Court of Appeals pointed out that every element of the crime of extortion was present except that the payment was not actuated by fear, and that " The threat of the defendant was plainly an act done with intent to commit the crime of extortion, and it tended, but failed, to effect its commission ". It logically follows that the threat which induces the fear must be made by the defendant or someone acting in concert with him and the fear thus instilled must be attributed to the person charged.

A fair reading of the definition of threats constituting extortion (Penal Law, § 851) indicates that the defendant charged must be a participant in the creation of the fear induced by threats.

In *People* v. *Rollek* (280 App. Div. 437, 439, affd. 304 N. Y. 905) the Appellate Division, Fourth Department held, in substance, that there must be " a threat which creates fear in the person threatened " to sustain a conviction. In this case both elements are absent. There was neither proof from which the jury could infer a threat by McNamara, nor was there evidence that the complainants were put in fear by any conduct on the part of the defendants.

To adopt the theory of the prosecution would require us to extend the scope of both pertinent sections of the Penal Law (Penal Law, §§ 580, 581), and we are not authorized or empowered to do so.

In construing penal statutes " according to the fair import of their terms ", as we are directed to do by the Penal Law (§ 21), we may not extend their scope so that acts, otherwise innocent and lawful, become crimes, unless there is a clear and positive expression of legislative intent to make them criminal (*People* v. *Shakun*, 251 N. Y. 107; *People* v. *Phyfe*, 136 N. Y. 554; *People* v. *Adamkiewicz*, 298 N. Y. 176, 179; see, also, *People* v. *Fein*, 292 N. Y. 10, 14; *Hornstein* v. *Paramount Pictures*, 292 N. Y. 468, 471).

Nor should a penal statute admit of such a double meaning that a citizen may act upon one conception of its requirements and the courts upon another (*People* v. *Brill*, 255 App. Div. 452, 454; *United States* v. *Capital Traction Co.*, 34 App. Cas. [D. C.] 592).

Mindful as we are of the commendable efforts of law enforcement agencies to curb insidious activities in labor-management relationships, the courts, nevertheless, may not disregard the

fundamental rights of one charged with crime. Under the American system of law, even the most corrupt and reprehensible individual may not be deprived of liberty unless his guilt is established within the confines of an applicable penal statute. A desirable end can never justify the use of impermissible or improper means.

The judgments of conviction should be reversed on the facts and the law, and the indictment dismissed.

BOTEIN, P. J. (concurring). While I agree that the convictions of the defendants cannot stand, I do not subscribe to the general proposition advanced in the majority opinion to the effect that the exploitation of an independently instilled and pre-existing fear cannot be deemed extortion unless the person receiving payment was *in particeps criminis* with the person who made the threat or instilled the fear.

A person who seeks to capitalize upon an existing fear implanted by others may under some circumstances be just as guilty as if he had originally initiated the fear. It is no less a crime because he has seized the opportunity and taken advantage of a situation ready-made for his purposes. No further threat need be made nor new fear instilled if he is able to persuade his potential victim that he has the power to do the act feared. This is true although there is in fact no power, only pretense.

A plausible but unfounded profession of the power to injure may seem just as real to the victim as though it were true — and therefore might be just as effective a means of exacting payment. The existence or nonexistence of the power to carry out the threat, alone or in concert with others, is not decisive. The efficacy of a threat depends upon the state of mind of the victim. It is the exaction under the *claim* of power that constitutes the offense.

Exploitation of a vague or generalized fear of itself may not be enough. To constitute extortion, the victim must believe, rightly or wrongly, that the person demanding payment will be in a position to inflict harm. The key is control or the pretense of control. A refusal to act to remove the cause of the pre-existing fear is not extorsive unless the victim is made to believe that the creation of the fear-producing situation can be ascribed to or its discontinuance rests with the defendant or those acting with him. Then, if payment is demanded for the manner in which that control will be asserted, the defendant is guilty of extortion.

It is the threatened misuse of power which is the essence of the crime. If a person has demanded payment to use his skill

or influence to affect the power possessed by others, or to ameliorate a condition he did not create, he is not guilty of extortion. His ability to predict with some degree of accuracy what course others not under his control may take, to foresee the consequences of action or inaction, or to plead the victim's cause successfully with others is not proof that he himself could inflict or avert the harm.

While there was certainly in this case an exploitation by the defendants of an existing fear, the People failed to prove that they in fact made any threats to misuse their own power. McNamara was at most an intermediary who undertook to use Kerin's money to attempt to influence others over whom he did not profess to have direct control, in an effort to persuade them to adopt the desired course of action. He assured Kerin that he would be successful in the attempt, but this was prediction, not a representation of control. McNamara made it very clear that before he could persuade the picketing unions to withdraw he would have to reimburse them for their organizational expenses. The District Attorney conceded in effect that there was no showing that the defendants had direct control over the pickets.

It was clear throughout the negotiations that the ultimate decision would be made by others, with some of the money being channeled to them by McNamara to influence the course of that decision. Not every refusal to act without payment is criminal. An expressed intention to remain indifferent or to refuse to act as intermediary unless payment is made cannot be equated with a threat affirmatively to inflict harm.

There may be circumstances under which extortion may be proven even though no explicit representation of control is made, or perhaps even when there is an explicit disavowal of control. However, when as here, there was no representation of control, when defendants expressly disavowed control and there was no belief on the part of the alleged victim that defendants exercised control, then the extorsive threat contemplated by the statute has not been proven.

The judgments of conviction should be reversed and the indictment dismissed.

VALENTE, J. (dissenting). Our initial concern in this case is whether, on the record before us, we can say as a matter of law that the defendants are not guilty of extortion.

Stripped of unessentials, it substantially appears that Mr. Kerin had for years operated his stationery business through two corporations as nonunion enterprises, apparently without

labor union problems. Suddenly, two unions* took steps to organize the two companies. This action was followed by the appearance of a picket on January 16, 1956 from a third union — Local 138 of the Teamsters' Union; and shortly after, by an organizer, from still another local, who was distributing literature to the corporate employees.** This activity seriously hampered deliveries and outgoing shipments, and because of the nature of the business, if continued, meant financial ruin.

It may be fairly inferred from the testimony that at this point Mr. Kerin was prepared either to buy his way out of his trouble or to buy his way into a union of his choice. In all probability, he was prepared to bribe — which undoubtedly accounts for his being a most reticent and diffident witness for the prosecution. If it was his intent to resort to bribery to buy his peace, he was entrapped in his own machinations and became the victim of a substantial, periodic extortion from the very one he would have seduced by the cheap " gift ".

In any event, in his search for a solution, he eventually found his way to the defendant McNamara. Meanwhile, his distress and anxiety were mounting. He succumbed to McNamara's terms and made an initial payment of $3,500, and agreed to pay $200 monthly thereafter to the Equitable Research Associates Incorporated — a so-called labor statistics organization and a creature of McNamara's codefendant — for services as labor consultant. He further agreed to recognize McNamara's union, Teamsters' Local 295, as the bargaining unit for his corporations. This understanding was reached at a meeting on January 20, 1956. On the next business day, January 23, the pickets were gone and Mr. Kerin's labor difficulties were over.

The significance of what occurred between Mr. Kerin and McNamara was left to the jury as a question of fact. Thus they were to determine whether what happened at the meeting amounted to a bona fide business agreement — as McNamara's attorney contended — or whether it constituted a violation of section 380 of the Penal Law (bribery on the part of Mr. Kerin of a labor representative [McNamara]) — as urged by the code-

---

* In November, 1955, he received a letter from Retail, Wholesale & Department Store Union, Local 585 of C. I. O. indicating they were attempting to organize the stationery industry. In December, 1955, he was visited by two organizers from Teamsters' Local 210 who detailed their plan of organizing.
** This was Local 1601, R. C. I. A. (Retail Clerks International Associates of the A. F. L.) whom Kerin had approached — after the inquiry of Local 585 of C. I. O. and Teamsters' Local 210 — stating he would like to have them represent his employees.

fendant — or whether it spelled out the crime of extortion on the part of the defendants — as the People insisted.

Little time need be spent on the contention that the agreement was a legitimate one for, patently, it was not. It is not without significance that Mr. Kerin's attorney, after two meetings with McNamara, withdrew from the matter because he was concerned with the propriety of it. This followed the meeting of his attorney with McNamara at the Park Lane Hotel where, according to the testimony, McNamara told the attorney that " something might be done, but that it would be expensive ", specifically, that it would cost from $5,000 to $10,000 to work out his client's problems.

As to whether what took place constituted a violation of section 380 of the Penal Law or the crime of extortion, a close question was presented. The learned Trial Judge in a comprehensive charge defined the provisions of section 380 of the Penal Law and then instructed the jury that if they believed that the payment made was for the purpose of bribing a labor representative or if they entertained any reasonable doubt in that matter, they should acquit the defendants because such payment then could not be the predicate of a charge of extortion. The court then went on and charged the elements of the crime of extortion.

The jury found the defendants guilty of extortion and there was ample evidence to warrant that finding.

The essence of the crime of extortion as defined by statute, is the wrongful obtaining of money or property from another by means of threats to inflict harm upon the victim unless there is compliance with the threat (Penal Law, §§ 850, 851).

The three salient elements of the crime in this case are the threat of harm, the fear of harm and the harm itself. No one will deny that when Mr. Kerin met with McNamara, Mr. Kerin's business was being harmed as a result of the picket activity and he was then and there fearful of the consequences to his business if it continued. So that when they met, Mr. Kerin very definitely was in fear of the continuance of a harm. Such a fear is the operative fact in the crime of extortion. That the defendants did not originate either the fear or the harm is of no moment so long as there is proof that they exploited it. Long ago it was held that it is immaterial whether the harm was first initiated by the defendant or by others, whether connected with the defendants or not (*People* v. *Thompson*, 97 N. Y. 313, 318).

This leaves for consideration the first element — the gravamen of the crime — a threat that a harm will be initiated, continued

or renewed unless there be a compliance with the demand. The earmark of extortion is a threat which exploits an existing harm or a present fear of harm. When the victim in his present fear yields to the threat, the crime is completed. To make out the crime the threat must emanate from the accused. There is no requirement that the fear or harm emanate from the accused, although they usually do. The threat need take no particular form and need not even be in precise words; and its existence can become a question of fact for the jury. It suffices if there be " the exercise of dishonest ingenuity in creating the impression of influence ". (*Commonwealth* v. *Neubauer,* 142 Pa. Superior Ct. 528, 533.)*

Of vital importance in the instant case is the fact that at the time of Mr. Kerin's conversation with McNamara, Mr. Kerin was already in fear of continued and even of additional harm. If McNamara, with the intent of exploiting this fear, gave the impression by word or deed at these meetings that he controlled the picketing and that it would continue unless he, McNamara, obtained from Mr. Kerin, and his corporations, the money or advantages he was seeking, there has been established the threat necessary to make out the crime of extortion. Whether McNamara did in fact control the picket line, is unimportant. One who points a toy pistol at another is not capable of using deadly force. But that action may support, depending upon the facts, a charge of robbery or even of extortion. It is enough that there was an intent to create an impression on the victim that one was in a position to inflict harm, and that the victim believed that person could inflict it. Because a picket line is a continuing destructive force, a wrongdoer is in a situation falsely to pretend that he can control its continuance, and, on that basis, obtain money or property on the threat that unless the payment is made the picket line will continue. So, here, if there is testimony from which the jury could be satisfied beyond a reasonable doubt that McNamara pretended to control the picket line — if indeed he did not actually control it — and that he expressly or impliedly represented that the picketing would continue unless his suggestions were followed and the payments were made under these conditions, then there would be as effective a threat as we would have if McNamara's suggestion had been in the form of an out

---

* In this case the defendant was convicted on testimony that he demanded money from a party convicted of operating a lottery as consideration for the accused giving information to the Trial Judge, pointing to that party's innocence. While the section under which the indictment was drawn includes blackmail and extortion, and makes the offender guilty of a misdemeanor, the essential element of the crime is that the victim pay the money through fear.

and out demand coupled with an "or else" ultimatum. Extortion can be as effectively accomplished with a mouthful of words as it can with the point of a gun.

If McNamara had come to Kerin with the proposition ultimately accepted, we would have a factual situation very similar to that in *United States* v. *Varlack* (225 F. 2d 665). There the prosecution and conviction was for a violation of the Hobbs Act, the Federal anti-racketeering statute, with provisions very similar to those in our extortion statute. In that case a sugar company was about to introduce mechanical devices for the loading and unloading of sugar from ships. The dock union opposed the plan because of a resulting reduction in employment. The defendants, who were local labor delegates aware of this opposition, informed the shipper that there would be trouble unless the latter co-operated — co-operation meaning payment to the defendants personally. It is noteworthy that the defendants there did not initiate the fear that moved the company to pay them. The court, per MEDINA, J., stated the proposition, as follows (p. 668): "There was accordingly substantial evidence from which the jury might have inferred that defendants seized upon the opportunity presented by the longshoremen's hostility to the company's introduction of technological improvements on its pier, to line their own pockets by implanting in the minds of the company officials the idea that unless and until the tribute demanded was paid to the defendants, the company's ships would not be unloaded. Whether these defendants did, in fact, have complete control over the members of the local is of little moment so long as there was evidence to support the jury's findings that the defendants' actions and words were intended to and did put the company officials, from whom the tribute was exacted, in fear that the failure to comply with the defendants' demands would result in work stoppages and in the indefinite prolongation of any work stoppages which had already occurred or might occur."

Hence, it is clear that whether McNamara initiated the picket line, or had the power to continue it, is not decisive of the case; just as it is quite immaterial when Mr. Kerin was first put in fear. It suffices if he was in fear when McNamara made the oblique threats and that the two were correlated by McNamara. What is important is that when Mr. Kerin met with McNamara, he [Kerin] was still in fear of continued or renewed harm flowing from the maintenance of the picket line.

Nor is it determinative in this case, on the question of the threat, that it was Mr. Kerin who sought out McNamara, rather

than conversely. While relevant and important, that fact is not decisive. It is material only on the question of whether a threat was made; not, however, on the question of fear — which clearly it does not negative. If anything, Mr. Kerin's approach to McNamara confirms a fear of harm, for he would not have gone to McNamara unless he feared the continuance of the destructive picket line. Moreover, it is a familiar gambit for one to pretend to be pursued, and then, to permit himself to be chased until he catches the pursuer. Therefore, the entire pattern of events, antecedent to, concurrent with, and even subsequent to the negotiations and conversations among the parties must be examined to determine whether there was an adequate factual basis for the jury to find that McNamara was in truth the pursuer while ostensibly seeming to be pursued.

The record permits not only that inference but the further ones that McNamara and his codefendant "cashed in" on the fear the picketing had created in Mr. Kerin's mind and wrongfully used it to "line their own pockets" (*United States* v. *Varlack, supra*).

The testimony indicates that Mr. Kerin met Mr. McNamara for the first time when the so-called deal was made. However, McNamara had met with Mr. Kerin's attorney previously and the substance of what transpired was communicated to Mr. Kerin.

It appears from the record that an intermediary submitted McNamara's name to Mr. Kerin's attorney as a high-ranking teamster official who might advise him. The purport of the testimony of the intermediary and the attorney is that McNamara was not too responsive when they initially discussed the problem with him, and indicated that the client should go ahead and negotiate — which was the last thing Mr. Kerin wanted. McNamara indicated, however, that the union was an old-line union and would be difficult, and that he did not encourage calling in either the State or National Labor Boards. His suggestion to the attorney that $5,000 to $10,000 would solve the problem was not made in the presence of the intermediary.

There is testimony that at this same meeting McNamara introduced a Mr. Milton Holt, secretary-treasurer of Teamsters, Local 805, as an attorney or possibly the lawyer for Equitable, and in the course of outlining their problems to him, McNamara opined that "this may be a situation where Equitable can help out" and that Mr. Holt appeared to agree.

Following that meeting, Mr. Kerin's attorney related to him what had transpired. Mr. Kerin, on cross-examination, testified

that his attorney told him that he [the attorney] had a rough evening with McNamara and that he was a tough-talking man who "knew what was going on, on this situation that we had found ourselves in; and that this man had told him the whole thing could be settled, and settled very quickly, for a payment of $10,000."

There is further testimony from Mr. Kerin's son, on cross-examination, that when the attorney was asked what would happen if the $10,000 weren't paid, that he replied: "this man could have orders issued down — to all the Locals of the Teamsters, through the Joint Council, to make the picket line 100% effective". It was following this talk that the Kerins' attorney announced that he was withdrawing from the matter and that if the Kerins wished, they could speak to McNamara themselves.

With this information added to his fears, Mr. Kerin shortly thereafter met with McNamara who, according to the testimony, had called the intermediary, inquiring as to what Mr. Kerin intended to do. This meeting took place on January 20, 1956 at a midtown club and there were present the Kerins, Senior and Junior, another representative of their corporation, McNamara and Milton Holt. At that session, McNamara again introduced Holt as an attorney. There is testimony that Holt was neither an attorney nor connected with Equitable.

According to the record, after some conversation, Holt suggested that McNamara and Mr. Kerin discuss the matter alone. In the course of this private talk, Mr. Kerin testified that McNamara told him that he [McNamara] liked his attitude, and he knew the officers of Local 138 and would like to have him [Kerin] identified with his Local 295. It was then that McNamara told Mr. Kerin, "Mr. Kerin, your troubles can be ended, and will be ended, if you do these three things". The first was that the Kerin corporations sign contracts with his union. The second was that $3,500 be paid to the Equitable Research Associates Corporation to defray the expenses incurred by the various unions seeking to organize the corporation, plus $200 a month to that same corporation for services, to take care of any labor problems that they had and to guarantee labor peace for the term of their contract.

Mr. Kerin testified that he was induced to believe that if he made these payments, his troubles would be at an end and he would have peace and contentment so far as the labor situation went. As to the picketing, Mr. Kerin swore: "He [McNamara] told me that the picketing would stop immediately if we made this agreement". With reference to the $3,500, McNamara told

Mr. Kerin " That we had to pay ", and that it represented the amount of money " that all these unions that have sought to organize you over the last several years have expended ". The $3,500 was paid. Contracts were entered into between the Equitable and Kerin corporations, were predated January 20, 1956 (the day of the conference at the midtown club), and were signed by the codefendant.

At the time the $3,500 was paid to Equitable, its bank balance was $375. Within nine days from the receipt of the $3,500, checks totalling $3,705.09 were cashed, leaving a balance of $171.99. Twelve of these checks, totalling $2,950.90, were payable to, signed and indorsed by the codefendant and entered on the corporate books as salary paid to him. The remainder were drawn to the order of different people for various amounts and in no wise indicate payments of any union organizational expenses.

There is testimony in the record of 11 officers of Teamsters Local 138 that they were the only ones who had the authority or power to call an official strike or to set up a picket line on behalf of their Local; that they never, at any time, authorized the placing of a picket at the Tower-Crossman Stationery Corporation, one of Kerin's corporations, or authorized the use of signs either there or at the place of business of the other corporation, the Atlas Stationery Corporation.

The evidence in the case establishes beyond a reasonable doubt that the defendants, acting in concert, wrongfully exploited Mr. Kerin's fear for their own advantage. Indeed, the record leaves one with the impression that the defendants staged the entire operation. It is evidence from which a jury could reasonably conclude that Mr. Kerin was terrorized into believing that the defendants had it in their power to continue the picketing, and that he was thereby induced to pay tribute in an attempt to avoid the consequent harm. All of the testimony outlined bears on the elements of threat of harm, fear of harm and harm itself and presented questions of fact for the jury. Those questions were resolved by the jury under a charge that quite adequately outlined the factors they should consider in determining whether the negotiations between McNamara and Mr. Kerin, were what the defense purported them to be, merely the seeking by Mr. Kerin of McNamara's assistance, or were an artful and disingenuous facade for the communication of an extortionist threat by McNamara to Mr. Kerin. The resolution of that factual question by the jury is sustained by the record. Hence, I must dissent from the decision of this court which would disturb that verdict.

McNALLY and STEVENS JJ., concur with M. M. FRANK, J.; BOTEIN P. J., concurs in opinon; VALENTE, J., dissents and votes to affirm in opinion.

Judgment [as to defendant Dioguardi] reversed upon the law and upon the facts, the indictment dismissed and the defendant discharged from custody.

Judgment [as to defendant McNamara] reversed upon the law and upon the facts, the indictment dismissed and the bail exonerated.

