**PRINTERS II, INC., Plaintiff,**

v.

**PROFESSIONALS PUBLISHING, INC., Defendants.**

**No. 84 Civ. 2745 (RWS).**

United States District Court, S.D. New York.

July 8, 1985.

As Amended July 26, 1985.

Flemming, Zulack & Williamson, New York City, for plaintiff; Gerald G. Paul, Pamela M. Sloan, New York City, of counsel.

Sudler & Barth, New York City, for defendants; Patrick Barth, Eric M. Cahalan, New York City, of counsel.

## OPINION

SWEET, District Judge.

This is a diversity action in which plaintiff Printers II, Inc. ("Printers II"), a District of Columbia corporation, seeks to recover sums owing as a result of its printing the third issue of "Physicians' Travel & Meeting Guide" (the "Guide"), a publication of defendant Professionals Publishing, Inc. ("Pro Pub"), a Nevada corporation with offices in New York City. Judgment will be entered in favor of Printers II upon the facts and conclusions set forth below.

The action was bifurcated as determined in prior opinions, and the nonjury portions were tried to the court by skilled and able counsel on April 1, 4–5, 9–11 and May 13–15, and finally submitted on June 3, 1985. The evidence establishes a course of dealing between the parties that was initiated in trust and confidence and that dissolved under financial pressures in a relatively short time into charges of chicanery and dilatory tactics. As a consequence, a resolution which should have been reached by sensible businessmen has become the subject of a court decree, to the advantage of neither side. The inability to deal rationally with each other may well have resulted from the similarities of the firms, their structures, and their initial relationship, which was described by one witness as symbiotic.

Printers II operates its commercial printing business in Tuxedo, Maryland with 225 employees operating seven presses, a bindery and certain preprinting processes, six days a week, twenty-four hours a day. Eighty percent of its ownership is held equally by the President, Robert Saum, Jr. ("Saum") and its Vice President Melvin Galloway ("Galloway"), who may be broadly termed the Mr. Inside and Mr. Outside, respectively, of the business.

Pro Pub is the brainchild of Stephen Salinger ("Salinger"), who is the publisher of

the Guide and has been, among other things, an associate professor of English, engaged in the jewelry business, and the publisher of "Playground," a publication describing events and facilities in the Virgin Islands, Salinger's residence during its publication. Salinger is the Chief Executive Officer of Pro Pub, a Nevada corporation not qualified to do business in New York but with offices here. Alexander Londine ("Londine") is its President. Pro Pub commenced business in 1982 by publication of the Guide.

The Guide is a glossy publication similar in appearance to "Travel and Leisure." It contains a listing of meetings, symposia, and seminars for doctors, described as Medical Event Data, which includes the dates, places and purposes of the events categorized. Editorial matter, articles and advertising are also included. Advertising is the principal source of revenue for the Guide, which has a subscription price of $20 an issue but which is mailed to non-subscribers as well.

The relationship between Saum and Salinger commenced satisfactorily with the printing of "Playground" by Printers II starting in 1980. When Salinger devised his plan for the Guide he discussed it with Saum, received quotes, and on January 21, 1983, 175,000 copies of the first issue of the Guide, consisting of 136 pages, was mailed.

In June and July, 1983 the second issue entitled Summer/Fall 1983 was printed by Printers II and mailed. The second issue consisted of two editions: the pharmaceutical version, which was intended for prescription writing doctors and the consumer version, which was geared to the remainder of the profession. The editorial content of each version was the same, but the advertising in the pharmaceutical version was greater, since certain of the ethical drug manufacturers restrict their advertising to only the prescription writing doctors. One-hundred fifty-five thousand copies of the 120–page consumer version and 135,000 copies of the 168–page pharmaceutical version were mailed by July 5, 1983.

Payments to Pro Pub by the advertisers were based in part on circulation figures, a factor which inhibited Pro Pub's ability to pay Printers II invoices on time or, in certain instances, within the 90 days required by the terms of the invoices. This was of concern to Printers II, who submitted the invoices to its bank in order to obtain financing. In the event of nonpayment within 90 days by Pro Pub, the credit arrangement between Printers II and its bank required a reduction in credit in the amount of the overdue payment. To obviate this problem, Printers II obtained a promissory note on May 31, 1983 as payment from Pro Pub in connection with certain of the invoices rendered with respect to the second issue. The promissory note was paid in full on July 20.

On October 1, 1983 Pro Pub gave a second promissory note in connection with the second issue, which it paid on December 13 with interest in a total amount of $196,-127.76. In effect, Printers II was being financed by its bank to enable production of the Guide since certain of the Guide's receipts were deferred. The relationship was understood by both parties. Printers II rendered invoices, and when requested by Pro Pub gave statements relating to the Guide's circulation, neither of which acts reflected all the facts entirely accurately, but were designed in each instance for third-party use.

These arrangements, though understood, were not the subject of any contract or bid subsequent to the first issue. No complaints were raised with respect to Printers II work or billing practice. Salinger was, however, dissatisfied with some of the paper used for the second issue and in August, 1983 met with Printers II employees on the subject in order to resolve the problem. One employee of Printers II was Wally Doerk ("Doerk") in whom Salinger reposed trust. It was he who brought the parties together initially, and it was he who had primary responsibility at Printers II for the Pro Pub account, which was becoming a, if not the, principal account of Printers II. When the relationship between Saum and Salinger began to deteriorate,

Doerk left Printers II and become a consultant for Pro Pub. Neither side called him as a witness.

During the August 1983 meeting on the subject of paper, Salinger met with Doerk and a Printers II employee, Rick Saum, and obtained prices for different paper stocks. He then went upstairs to Robert Saum's office where the selection of the paper to be used was discussed. The shortage of paper was considered, and it was concluded that an early purchase would be desirable. Saum advised Salinger that Pro Pub would be invoiced when "the paper hit the floor." Saum gave paper prices to Salinger that were higher than had been quoted by Printers II employees downstairs. Saum also gave Salinger a formula to estimate the costs of paper relative to the number of pages produced. Salinger testified that he believed the prices quoted by Saum to be the price to Pro Pub for the paper to be purchased. No such statement was made, however, and there was no agreement as to the cost of the paper to Pro Pub, particularly in view of the fact that it had not yet been purchased.

Although it had not been set forth during dealings between the parties over "Playground" and the first two issues of the Guide, it had been the practice of Printers II to bill for prep charges, that is, charges for the preparation of plates and similar activities, for paper, for printing, for binding, and for delivery and mailing. Initially, certain of the prep charges were performed by Printers II affiliates, but Salinger was dissatisfied with the work performed and made arrangements for certain of the data processing to be done elsewhere. When Printers II had work performed by outside contractors, a markup was added, a practice which obtained with respect to the cost of paper to Printers II. The printing costs were calculated by a computing process which was based on the number of employees, presses and time involved, as well as a markup.

On October 20 the paper purchased for the third issue was invoiced to Pro Pub in the amount of $97,435.00 in accordance with the parties' understanding. The invoice contained a markup over the cost to Printers II and was forwarded to Printers II's bank for financing. No complaint or other reaction was received from Pro Pub.

By November the job was in progress with a target date of December 15, and Printers II commenced rendering additional invoices. Printers II had determined that as with the prior issue, so-called "Perfect Binding" would be done, by Specialties Binding, a nearby company which possessed the equipment necessary to accomplish such binding, since Printers II did not have the requisite equipment. The printing and binding processes were complicated by the number of inserts from advertisers, which were late in arriving, by the need to produce the two separate versions, and by the use of a more expensive paper for a limited production issue for copies to be supplied to advertisers. The complications were set forth visually in a mock-up which Doerk provided to Specialties Binding in December. Because of these difficulties, the binding operation required eight variations of the publication. In addition, Specialties Binding had significant other commitments. With the equipment working night and day, except for the Christmas holidays, the binding was completed by late January.

The principal problem which delayed completion of the binding was the tip-on, a promotional four page die cut subscription reply folder attached to the cover. This tip-on was not a standard size and could not be applied by Specialties Binding's machines and required hand application.

All involved were concerned by the delays. On December 15 Printers II forwarded invoices including bindery charges. Salinger considered the charges excessive. Saum counselled him not to raise the issue of payment until the job had been removed from the bindery. Between December 13 and 21 Printers II delivered 135,080 copies of the pharmaceutical version, consisting of 240 pages for mailing, and Printers II mailed 185,000 copies of the consumer ver-

sion, consisting of 168 pages, between December 28 and January 21, 1984.

The printing performed by Printers II was done in timely fashion after the submission of the final copy, and the binding was similarly satisfactorily performed, given the complications inherent in the production as evidenced by Doerk's mock-up on December 15. Meanwhile, on January 18, 1984 the paper invoice became due and payable and Saum called Salinger seeking payment. Saum told Doerk that without some resolution the work would be stopped. This possibility was conveyed to Salinger, presumably by Doerk, and the invoice was paid on January 23. From that time on the propriety of the invoices rendered was challenged by Salinger.

Saum, after investigation, gave Pro Pub a credit for unused paper and obtained a reduction in the Specialties Bindery bill. He collected all the relevant data, mailed a final invoice dated January 17, and then armed with calculations showing that the mark-up on the third issue was less than on the two prior issues, he came to New York on January 27 to resolve the amounts owed by Pro Pub. After a discussion, Salinger stated he would have to confer with his board. No payment was made.

In February, Printers II retained a consultant, Kathryn Rand, who reviewed the Printers II documents, conferred with Londine and on February 15, 1984 submitted a revised bill. In a telephone call shortly thereafter, Printers II through Ms. Rand, offered to accept $386,000 in payment for services rendered in connection with the third issue of the Guide, and Londine indicated he might get authority to offer $381,000 for services rendered in connection with the Guide. However, Ms. Rand also indicated that there were additional invoices outstanding in the amount of approximately $78,000, and Londine broke off the discussions. Saum called Salinger later that day and indicated the additional invoices were closer to $39,000. In fact the amount of the additional invoices for material and services only a small part of which were for the third issue itself was $34,533.-

44 and has not been disputed. In response to Salinger's request, Printers II sent a final adjusted bill in the amount of $373,470.-43 on April 18, giving credit for the $97,435 already paid.

The invoices sent by Printers II to Pro Pub contained certain trade practice provisions; and there was expert testimony presented as well as the testimony of the parties concerning the practices established by the parties. It is customary in the industry for printers performing the functions performed by Printers II in this transaction to markup invoices for supplies, such as paper, as well as invoices rendered by the suppliers of services, such as Specialties Bindery. The preponderance of the evidence establishes that a 5%–10% markup of such invoices is customary and that Printers II's invoices were properly within this range. The practices employed by Printers II with respect to the remainder of its billing were also consistent with industry practice.

Once the negotiations had broken down and the final adjusted billing rendered, Saum determined to exert whatever pressure he could to obtain payment. In early April he wrote to advertisers in the Guide advising them of the dispute with Pro Pub and its failure to pay the amounts Printers II claimed to be owing. These letters raised questions with certain advertisers who contacted Pharmaceutical Media, Inc., the exclusive agency used by Pro Pub to obtain the advertisers. Although Mead Johnson did not renew its advertising for the fourth issue of the Guide, Pro Pub failed to establish that the Saum letter was the cause for the Bristol Meyers action. Instead, Mead Johnson was dissatisfied as a result of improperly handled copy, unsatisfactorily explained by Salinger. No damages were established to have resulted as a consequence of Saums' letter with respect to the four advertisers who did not renew their advertising in the fourth issue of the Guide.

Printers II printed and delivered the third issue of the Guide to Pro Pub, at Pro Pub's request, under the clear and reasonable expectation of getting paid for these

services. The 320,000 magazines printed and mailed to the recipients designated by Pro Pub were accepted by Pro Pub. Printers II duly invoiced Pro Pub for the cost of its services. *See, e.g., In re Rich,* 337 A.2d 764, 766 (D.C.App.1975) (plaintiff can recover for reasonable value of services under *quantum meruit* when valuable services are rendered for the person to be charged and services are accepted, used and enjoyed under circumstances where person to be charged is reasonably notified that plaintiff expects payment). Both sides agree that Maryland law governs the breach of contract and *quantum meruit* claims since performance of the contract—printing and delivery of the third issue of the Guide to the United States Postal Service—took place in Maryland.

Under the facts set forth, there was no specific contract governing the production of the Guide. It was governed by a course of dealing with open price terms. Although the U.C.C. does not explicitly refer to course of dealing in filling in an open price term, it has been interpreted that this method is proper under the Code. Although a contract to print a magazine is not one for the sale of goods and hence the U.C.C. is not directly applicable, *North American Leisure Corp. v. A. & B Duplicators Ltd.,* 468 F.2d 695, 697 (2d Cir.1972); *W.H. Smith Publishers, Inc. v. Plexus Publishing Ltd.,* 557 F.Supp. 546, 548 (S.D. N.Y.1983), nonetheless the U.C.C. reflects the modern trend in contracts and is a useful analogy. U.C.C. § 2–305 provides that when a contract does not specify a price, the reasonable price at the time of delivery will be the contract price. "Neither the Code nor the Official Comments to the Code require that a merchant-seller price at a fair market value under a contract with an open price term, but specify that prices must be 'reasonable' and set pursuant to 'reasonable commercial standards of fair dealing in the trade'." *TCP Industries, Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 548 (6th Cir.1981). As reflected in the facts found, Printers II's April 18, 1984 invoice represented a fair and reasonable charge for the production of the Guide.

The services performed and the goods produced were worth the amounts for which Printers II charged in the final adjusted bill on April 3, and Printers II became entitled to payment of these sums on *April 3, 1984,* the date of the submission of those invoices.

■ Pro Pub has counterclaimed for the $97,435 payment, alleging duress and extortion and in addition a civil cause of action under New York Penal Law § 155.-05, the latter giving rise to its as yet unresolved jury counterclaim. Even assuming that Saum's comment to Doerk, that the Guide would not be mailed unless the paper invoice was paid, was intended to be relayed to Pro Pub, it does not constitute duress or extortion. Printers II demanded payment of the October 20, 1983 paper invoice pursuant to an agreement with Pro Pub. Pro Pub's failure to pay constituted a breach of that agreement, enabling Printers II to threaten to suspend its own performance and demand payment. *Fromm Sales Co. Inc. v. Troy Sunshade Company,* 222 Md. 229, 159 A.2d 860, 863 (Ct.App. 1960). It was not extortion for Printer II to demand what it was rightfully entitled to receive under an agreement. Duress exists where there is a wrongful act depriving another of the exercise of his free will. *Eckstein v. Eckstein,* 38 Md.App. 506, 379 A.2d 757, 761 (1978); *Bell v. Bell,* 38 Md. App. 10, 379 A.2d 419, 423 (1977); *Stewart M. Muller Construction Co., Inc. v. New York Telephone Co.,* 40 N.Y.2d 955, 390 N.Y.S.2d 817, 359 N.E.2d 328 (1976). A threat to do that which a party has the right to do does not constitute duress. *Gerstein v. 532 Broad Hollow Road Company,* 78 A.D.2d 292, 429 N.Y.S.2d 195, 199 (1st Dep't 1980).

■ Printers II's demand that if the payment was not made it would cease delivery of the third issue was a justified response to Pro Pub's failure to pay the invoice. Printers II would have had the right to suspend delivery as a result of Pro Pub's failure to pay the amounts set forth on the submitted invoices. *See Fromm Sales Co.,*

*Inc.*, 159 A.2d at 863 (failure to pay for merchandise under contract for distribution of manufacturer's awnings and canopies constituted a material breach, justifying termination of agreement); *see also* Exhibit III–X. Therefore, the defenses or counterclaims of duress and extortion are dismissed.

■ Because the counterclaims are dismissed, I need not decide whether Pro Pub, a Nevada corporation not qualified to do business in New York, could properly file counterclaims under Business Corporation Law § 1312. The authorities indicate, however, that a corporation though not qualified to do business in New York and unable to file an action, may still raise counterclaims arising out of a cause of action upon which the corporation is sued. *See Tri-Terminal Corp. v. CITC Industries*, 100 Misc.2d 477, 419 N.Y.S.2d 817 (S.Ct.1979); *Intra-Mar Shipping v. John Emery & Co.*, 11 F.R.D. 284 (S.D.N.Y.1951). Consideration of the merits of the counterclaims is therefore proper.

■ Assuming that the facts presented in the bench trial cannot differ materially from those presented on Pro Pub's jury counterclaim for larceny, it too must be dismissed. No cases have been cited giving rise to a civil cause arising out of a criminal act, but even if the civil claim is assumed, there has been a failure of proof that the crime has been committed. Larceny by extortion requires the taking of property. *People v. Dioguardi*, 8 A.D.2d 426, 188 N.Y.S.2d 84, 90 (1st Dept.1959) (extortion is the obtaining of property from another, with his consent, delivery of property being induced by force or fear), *rev'd on other grounds*, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 168 N.E.2d 683 (1960).

Neither threatening to contact the Guide's advertisers nor sending the advertisers letters constitutes the crime of extortion since Printers II did not obtain any money from Pro Pub after the January 23, 1984 payment by Pro Pub of the $97,-435.00, and that payment has been determined not to have been obtained through extortionate means. Pro Pub has failed to prove that Printers II intended to exercise "dominion and control over the property wholly inconsistent with the continued rights of the owner," *People v. Ricchiuti*, 93 A.D.2d 842, 461 N.Y.S.2d 67, 70 (2d Dep't 1983), *quoting People v. Olivo*, 52 N.Y.2d 309, 438 N.Y.S.2d 242, 420 N.E.2d 40 (Ct.App.1981), that is, that defendant knowingly took property without the rightful owner's consent.

Finally, Pro Pub seeks to resist Printers II's recovery by counterclaiming for libel and tortious interference with its advertising contacts and asserting a prima facie tort as a consequence of the letters sent by Saum to its advertisers in April. Both parties seem to agree that New York law is applicable to the letters sent into this state. Any damages Pro Pub claims to have suffered as a result of lost advertising were presumably felt in New York. *Cf. Church of Scientology of California v. Green*, 354 F.Supp. 800, 803 (S.D.N.Y.1973) (under New York's conflict of law rules, law applicable to tort of libel is place of most significant relationship: New York law applies where defamed party resides in New York, allegedly libelous letters were received in New York, and publication to third parties in all but one instance took place in New York); *Reeves v. American Broadcasting Co.*, 580 F.Supp. 84, 90 (S.D.N.Y.1983) (although defendants were New York residents and defamatory report was broadcast from Washington, D.C., defamation action was governed by California law, because plaintiff was California resident and report concerned activities in California).

■ Libelous the letters were not, for they contained no misstatement of fact and because truth is a complete and absolute defense to a claim for libel. *Droner v. Schapp*, 34 A.D.2d 823, 311 N.Y.S.2d 934, 935 (2d Dep't 1970); *Commonwealth Motor Parts Limited v. Bank of Nova Scotia*, 44 A.D.2d 375, 355 N.Y.S.2d 138, 141 (1st Dep't 1974).

■ However, Saum did intend to interfere with Pro Pub's advertising contracts and thereby to put "pressure" on Pro Pub

to pay up. Intentional interference with contractual relations requires the existence of a valid contract between the plaintiff and another, defendant's knowledge of that contract, defendant's intentional procurement and breach of that contract, and damages. *International Bureau for Protection and Investigation v. Public Service Employees Union Local No. 80,* 98 Misc.2d 409, 413 N.Y.S.2d 962, 969 (Sup.Ct.N.Y.Co. 1979); *Livoti v. Elston,* 52 A.D.2d 444, 384 N.Y.S.2d 484, 485 (2d Dep't 1976).

 Although the placement of advertisements in the Guide was never accomplished by way of a contract between Pro Pub and the advertisers, and any "insertion orders" the Guide may have had for the fourth issue were, in accordance with industry-wide practice, cancellable by the advertisers without penalty, presumably prior to publication, the orders were in fact contracts. Saum sought to affect these as well as Pro Pub's possible future business. However, as set forth above, Pro Pub was unable to establish any damages as a result of Printers II's actions, and the interference with contract cause of action must fail.

 A cause of action based on prima facie tort is reserved for those cases falling outside the ordinary categories of tort. *National Nutritional Foods Ass'n v. Whelan,* 492 F.Supp. 374, 383 (S.D.N.Y.1980). However, Pro Pub bases all its counterclaims on the same allegations. If allegations are insufficient to sustain a traditional cause of action, such as libel or tortious interference with contract, a party cannot prevail under this tort. Further, of course, motives of profit or economic self-interest are not malicious, and even if they are mixed with malice or personal animus, recovery is still barred under a theory of *prima facia* tort. *Rodgers v. Grow-Kiewit Corp.-MK,* 535 F.Supp. 814 (S.D.N.Y.1982).

 Since Pro Pub's counterclaims are to be dismissed, what remains is the matter of prejudgment interest from April 3, the date of the rendition of the Final Adjusted billing. A debt is liquidated if, at the time it arose, it was an easily ascertainable sum certain. *Hartford Accident and Indemnity Company v. District of Columbia,* 441 A.2d 969, 974 (D.C.App.1982). Prejudgment interest is generally allowed where there is a sum certain and is allowed as part of damages in the discretion of the judge. *Id; Atlantic States Construction Company v. Drummond & Company, Inc.,* 251 Md. 77, 246 A.2d 251 (1968). If it is provided for, prejudgment interest is calculated at six percent per annum. *Hubler Rentals, Inc. v. Roadway Express, Inc.,* 459 F.Supp. 564 (D.Md.1978), *aff'd in part, rev'd in part,* 637 F.2d 257 (4th Cir.1981); *Peerless Insurance Co. v. Bd. of County Commissioners,* 248 Md. 439, 237 A.2d 15 (1968).

 Here there was no valid, reasoned basis for nonpayment particularly given Londine's mid February offer. Despite Saum's tortious conduct, which failed to damage Pro Pub, the creditor in this instance should be made whole. Pro Pub cannot be permitted to benefit from its use of sums due and owing to Printers II for the production of the Guide which had been distributed and for which Pro Pub had been, or was being, paid. To hold otherwise would be to grant Pro Pub an unjustified windfall, and prejudgment interest will be allowed.

Submit judgment, with costs, on notice in accordance with these findings and conclusions.

IT IS SO ORDERED.