Daniel GARSHMAN and Donald Frank, as General Partners for Tarbell I, a Limited Partnership, et al., on their own behalf and as representatives of all private persons and business entities throughout the United States who are gas producer/investors who have funded gas well exploration in New York and Pennsylvania for resale to the pipeline services of Columbia Gas Transmission Corporation, Plaintiffs,

v.

UNIVERSAL RESOURCES HOLDING, INC., a Pennsylvania Corporation; U.S. Energy Development Corporation, A New York Corporation; Chautauqua Energy, Inc., a New York Corporation; Columbia Gas Transmission Corporation, a Delaware Corporation; and the Columbia Gas System, Inc., a Delaware Corporation, Defendants.

Civ. A. No. 85-2369 (SSB).

United States District Court,
D. New Jersey.

Jan. 3, 1986.

Valore, McAllister, Westmoreland, Gould, Vesper & Schwartz, P.C. by Robert N. McAllister, Northfield, N.J., for plaintiffs.

McCarter & English by James F. Hammill, Cherry Hill, N.J., Cravath, Swaine & Moore by John E. Beerbower, New York City, for defendants Columbia Gas Transmission Corp. and The Columbia Gas System, Inc.

Tomar, Parks, Seliger, Simonoff & Adourian by William Tomar, Haddonfield, N.J., for defendants Universal Resources Holding, Inc., and Chautauqua Energy, Inc.

Capehart & Scatchard, P.A. by William B. Scatchard, Moorestown, N.J., for Defendant U.S. Energy Development Corp.

OPINION

BROTMAN, District Judge.

Plaintiffs David Garshman and Donald Frank, general partners for Tarbell I ("Tarbell"), a Pennsylvania limited partnership which invests in oil and gas exploration, bring this proposed class action alleging antitrust violations and breach of contract against several companies which finance their drilling operations with investors' funds and against the pipeline company which services those wells and purchases most of the fuel produced. Defendant Columbia Gas Transmission Corporation ("Columbia") now moves to dismiss the complaint for failure to state a claim for which relief can be granted. Fed.R.Civ.P. 12(b)(6). Columbia also challenges plaintiffs' standing to bring claims under the Sherman and the Clayton Antitrust Acts, 15 U.S.C. §§ 1, 2, 15 and 26. Columbia's motion is joined by defendant U.S. Energy Development Corporation ("U.S. Energy"). Plaintiffs oppose Columbia's motion and move for leave to file an amended complaint. Jurisdiction is based on 28 U.S.C. § 1337, 15 U.S.C. § 4, and theories of pendent jurisdiction.

## I. FACTUAL BACKGROUND

The complaint alleges causes of action under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2; Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26; and the doctrine of pendent jurisdiction over state law claims for breach of contract and civil conspiracy. Briefly stated, plaintiffs' claim is that all defendants conspired to fix the prices which Columbia would pay for natural gas produced by the wells in which plaintiffs held a significant financial interest at lower levels than provided for in existing contracts.

The complaint's legal sufficiency must be examined in light of the facts it pleads, and all factual allegations in the complaint must be accepted as true for purposes of this motion to dismiss. *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983).

According to the complaint, Columbia contracts for new supplies of natural gas and transmits the gas through its pipeline system for later sale to residential and commercial users in several states. Columbia is a wholly owned subsidiary of defendant The Columbia Gas System, Inc. ("Columbia System"), which is in the business of finding, producing, purchasing, transmitting, storing and delivering natural gas. Defendant Universal Resources Holding, Inc. ("Universal"), provides the material and personnel required to drill gas wells and transmit the extracted gas to a pipeline for eventual distribution. Defendants Universal, U.S. Energy and Chautauqua Energy, Inc., are known in the industry as producers. Like other producers, Universal generally sells the rights to the expected production of gas to investors, normally limited partnerships like Tarbell, who pay the producers fees for exploration, fees for successfully bringing the wells into production, and periodic payments based on the value of the production realized over the life of the wells.

Columbia and Universal entered into a contract on November 23, 1981, under which Universal agreed to produce and Columbia agreed to purchase natural gas from certain wells in western New York State through 1986 at the maximum lawful price applicable. That agreement sprang from and reflected a complex mix of market and regulatory forces, the crucial elements of which were a severe undersupply of natural gas during the mid-1970s and the enactment of the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. §§ 3301 *et seq.*, which sought to ameliorate the shortage through partial decontrol of prices.

Between 1972 and 1978, Columbia could not satisfy its customers' demands for nat-

ural gas. NGPA's drilling incentives enabled Columbia to meet 100 percent of that demand in 1979. That success apparently prompted Columbia to secure adequate supply contracts, like that with Universal, for estimated future demand. As it turned out, Columbia seriously misjudged that future demand.

Under the contract with Universal, Columbia leased to Universal a tract of land in Chautauqua County, New York, on the condition that Universal deliver all of the natural gas produced on the land to Columbia. Columbia, in turn, obligated itself in any given year to take or pay for at least 75 percent of the wells' estimated yearly output of gas. Such an agreement is referred to as a "take or pay" contract and is standard in the natural gas industry. The price to be paid was the "maximum lawful price applicable" under federal statutory and regulatory authority. Columbia, or its parent company, operates the only pipeline in the western New York/northwestern Pennsylvania region which is the subject of this lawsuit.

On June 21, 1983, Universal entered into an agreement assigning all of its rights and duties under the "take or pay" contract to Garshman, the managing general partner of Tarbell. However, Universal retained a financial interest in the wells that varied with the volume and price of gas sold to Columbia and with the number of wells that were drilled. The assignment was to take effect after Universal completed work on the wells and Garshman made obligatory payments.

Subsequently, the market for the production and sale of natural gas changed significantly. Falling oil prices enhanced that fuel's attractiveness and successful conservation efforts coupled with a decline in industrial activity led to a drop in usage and demand for natural gas. On the supply side, the higher prices imposed by the NGPA's regulatory scheme prompted new exploration and development. As exploration under the form of contract drawn between Universal and Columbia became increasingly productive, Columbia's liability to "pay" for gas produced but not "taken" began to approach $2 billion or more.

Faced with this dramatic shift in the market, and saddled with overwhelming contractual obligations through 1986, Columbia sought to renegotiate the prices it paid to producers like Universal in order to bring those prices in line with market levels. Columbia allegedly coerced producers into renegotiating price terms by threatening that it would not assign leases for future exploration to producers who did not renegotiate existing contracts. Columbia also allegedly threatened to curtail the amount of gas it took from those producers by cutting production allocation and manipulating pressure in the pipeline. In other words, Columbia allegedly threatened to refuse to deal in the future with producers who failed to comply with its present demands.

Universal eventually capitulated and a new price clause was incorporated into its contract with Columbia by an agreement dated August 29, 1984. Columbia has purchased gas under that contract pursuant to its terms since that time. Plaintiffs claim that they were never notified of this renegotiation and that because of the assignment of that contract, Universal had no authority to renegotiate on their behalf. Plaintiffs further claim economic injury as a result of the renegotiated price clause.

## II. PLAINTIFFS' MOTION TO AMEND THE COMPLAINT

Plaintiffs seek to amend their complaint under Fed.R.Civ.P. 15(a) to add allegations of facts which came to their attention after they filed the original complaint. Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." Additionally, federal courts have generally recognized that a liberal amendment policy enables controversies to be decided on their merits. *Forman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *United States v. E.B. Houghan*, 364 U.S. 310, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960). Accordingly, the court will allow plaintiffs to amend the complaint. All ref-

erences to the "complaint" in this Opinion shall be to the amended complaint.

## III. DEFENDANT COLUMBIA'S MOTION TO DISMISS THE COMPLAINT

### A. The Rule 12(b)(6) Standard

A Rule 12(b)(6) motion addresses the legal sufficiency of the complaint. Under Fed.R.Civ.P. 8(a)(2), the complaint must include only a "short and plain statement of the claim" whose purpose is to give defendant fair notice of the nature and substance of the claim. *See Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Third Circuit has held specifically that neither evidence nor an exhaustive array of facts must be pleaded. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir.1977). As a general rule, courts must construe pleadings liberally; this is especially true of antitrust complaints. *Capital City Pub. Co. v. Trenton Times Corp.*, 575 F.Supp. 1339, 1342 (D.N.J.1983) (Ackerman, J.). Justice Marshall has noted that "in antitrust cases where the proof is largely in the hands of the alleged conspirators, ... dismissals should be granted sparingly." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976).

Recently, however, courts have focused on "the heavy costs of modern federal litigation, especially antitrust litigation, and the mounting caseload pressure on the federal courts," and made clear that some minimal and reasonable particularity in pleading is required to sustain a claim of violation of the Sherman Act. *Sutliff, Inc. v. Donovan Co.*, 727 F.2d 648, 654 (7th Cir.1984); *see In Re Plywood Antitrust Litigation*, 655 F.2d 627, 641–42 (5th Cir. 1981), *cert. dismissed*, 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983). As the *Sutliff* court explained:

> The pleader will not be allowed to evade this requirement by attaching a bare legal conclusion to the facts that he narrates: if he claims an antitrust violation, but the facts he narrates do not at least outline or adumbrate such a violation, he

will get nowhere merely by dressing them up in the language of antitrust. 727 F.2d at 654.

With these standards firmly in mind, the court concludes that plaintiffs in the case at bar could prove no set of facts in support of their claim that would entitle them to relief.

### B. The Antitrust Claims

■ Count I alleges antitrust violations under Sections 1 and 2 of the Sherman Act, specifically price fixing and monopolization. To overcome defendant's motion to dismiss, plaintiffs must allege the existence of a conspiracy with a unity of purpose, identify its parties and the time during which it operated, and cite actions allegedly taken to effectuate it. *Capital City Pub. Co., supra; see also Leeward Petroleum Ltd. v. Mene Grande Oil Co.*, 415 F.Supp. 158 (D.Del.1976); *McKnight v. Southeastern Pennsylvania Transit Authority*, 583 F.2d 1229, 1235–36 (3d Cir.1978).

Preliminarily, the court notes that the circumstances of this case are unusual in several respects. In a conventional antitrust case, consumers or distributors attack the allegedly anticompetitive conduct of one or several sellers who possess monopoly power in a certain market. In this case, the reverse is true: Columbia is an allegedly monopsonistic buyer, regulated as a monopoly because its pipeline is the only transportation network in the region, and the producer defendants like Universal are intermediaries between Columbia and plaintiffs, the ultimate sellers of the natural gas. Few reported cases involve analogous fact patterns. *Compare Venture Technology, Inc. v. National Fuel Gas Co., et al.*, 1980–81 Trade Cas. (CCH) ¶ 63,780 (W.D.N.Y.1981).

#### 1. *Section 1 of the Sherman Act*

Section 1 of the Sherman Act provides: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. Initially, the court must consider whether plaintiffs allege sufficient facts to support the conclusion that a contract, combination or conspiracy exists or existed among defendants Columbia, Universal and the other producers. If so, then the court must decide whether such contract, combination or conspiracy is an unreasonable restraint of trade. *See Sitkin Smelting & Ref. Co. v. FMC Corp.*, 575 F.2d 440, 445 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978).

### a. *Conspiracy*

Paragraph 43 of the complaint alleges that since at least as early as 1979, Columbia and the other defendants have engaged in a combination and conspiracy among themselves to fix, depress or stabilize the price of "take or pay" natural gas that is resold in interstate commerce. However, every anticompetitive act allegedly committed to effectuate the purported combination and conspiracy is attributable to Columbia alone. The complaint alleges that Columbia, *inter alia*, (a) coerced compliance with its renegotiation demands by threatening to or carrying out its threat to cut the minimum take allocation from gas wells, cut the price paid for take or pay gas, or "shut in" (i.e. close down) gas wells altogether; (b) threatened producers/investors with a future refusal to deal; (c) threatened producers/investors with denial of access to Columbia's pipeline; (d) induced producers/investors to invest in the industry by offering and then reneging on promises of high prices; and (e) manipulated the pipeline to slow the volume of gas produced in order to reduce its contractual "take or pay" liability.

■ According to the allegations, Universal and the other producers were victims of Columbia's allegedly aggressive, coercive tactics. Nothing in the complaint suggests that absent alleged threats of future refusals to deal and manipulation of pressure in the pipeline, the producers would voluntarily have reduced the price to which they, and by assignment the plaintiffs, were contractually entitled. Econom-

ic coercion is not a viable defense to a charge of horizontal price fixing. *Duplan Corp. v. Deering Milliken*, 594 F.2d 979, 982 (4th Cir.1979) (per curiam), *cert. denied*, 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980) (no defense for knowing participation in horizontal patent restraint regardless or reluctance, coercion, or motives conflicting with other conspirators); *Commonwealth Edison Co. v. Allis Chalmers Mfg. Co.*, 245 F.Supp. 889, 892 (N.D. Ill.1965) (economic coercion no defense to participation in horizontal price fixing). The instant case, however, alleges a vertical conspiracy among all defendants. Professor Areeda has identified several relevant factors which a court should consider in deciding whether the victim of alleged coercion may be deemed a co-conspirator. *See* P. Areeda & D.F. Turner, *Antitrust Law*, ¶ 1408b (1978, 1986).

■ The typical vertical coercion case arises when an unwilling dealer who is threatened by his supplier with termination promises to buy a second commodity, to deal exclusively, or to restrict resales. *E.g. Perma Life Mufflers v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). Where, as in *Perma Life, supra*, the manufacturer's coercion results in an express contract, it is the contract and not the coercion that creates the anticompetitive agreement. *See generally* Areeda, ¶ 1452b. The dealer's reluctant compliance, however justified, is ordinarily no defense. *See United States v. Paramount Pictures*, 334 U.S. 131, 160–61, 68 S.Ct. 915, 930–31, 92 L.Ed. 1260 (1948) (contract with unlawfully restraining term violates Section 1 notwithstanding claim that one of the parties was forced into it by other party's bargaining power). However, as Areeda observes, this type of conspiracy "is usually found for the purpose of giving an antitrust remedy against the person making the improper demand, and, typically, in favor of the coerced 'conspirator.'" Areeda, ¶ 1408d.

Areeda suggests that a court should also consider whether the coerced behavior is actionable under another section of the antitrust laws and whether the coerced party will be protected or punished by a finding that the coercion created a conspiracy. *Id.* ¶ 1408b.

In this case, the court is reluctant to find the existence of conspiracy when doing so might subject Universal, a possible victim of coercion, to liability for treble damages. However, as the court's later analysis makes clear, this issue is a red herring. Even if the court were to find that the complaint alleged facts sufficient to support a conspiracy theory, its other deficiencies are fatal.

### b. *Price Fixing*

The prevailing standard by which alleged Section 1 conspiracies are judged is the so-called "rule of reason". *Continental T.V., Inc. v. G.T.E. Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The essential principle behind the rule of reason is that "contractual restraints fall within the prohibition of Section 1 only when their purpose and effect is found to have imposed an undue restraint on commerce." *Sitkin Smelting, supra,* 575 F.2d at 447. Some restraints on commerce, however, are *per se* violations of the antitrust laws. *Northern Pacific Ry. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

The Supreme Court has held that "any combination formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se* under § 1 of the Sherman Act." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). The Court has specifically condemned horizontal agreements among competitors to fix prices and vertical resale price maintenance agreements. *See Pa. Dental Assn. v. Medical Serv. Assn. of Pa.*, 745 F.2d 248, 256 (1984) (citing cases).

There is an important factual distinction between the case at bar and the typical vertical price fixing case: the prices allegedly fixed by the defendants are the price of the gas produced by Universal and the other producers and sold to Columbia, not the resale price charged to third parties. "The price fixing within the scope of the *per se* prohibition of § 1, however, is an agreement to fix the price to be charged in transactions with third parties, not between the contracting parties themselves." *Sitkin Smelting, supra,* 575 F.2d at 446, *citing United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). As the Third Circuit Court of Appeals has noted, where the facts "differ greatly from the vertical arrangements to restrict resale prices invalidated in *Albrecht* and [*Kiefer-Stewart Co., v. Joseph Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951)], we should be hesitant to condemn them under the *per se* rule." *Pa. Dental, supra* at 259.

The court concludes that the alleged acts taken to fix prices in the natural gas industry do not make out a *per se* violation of Section 1 of the Sherman Act. If the price fixing is not *per se,* the rule of reason applies. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918). "Essential to a finding of a § 1 violation is concerted action; unilateral action is not proscribed." *Pa. Dental, supra* at 255, *citing Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1468, 79 L.Ed.2d 775 (1984).

The complaint alleges unilateral actions by Columbia which were taken to coerce the other defendants into accepting a lower price for their gas. Even if plaintiffs were able to prove every allegation, and even if the facts showed the existence of a coerced conspiracy, the court does not believe that the complaint states an actionable price fixing claim under Section 1. The alleged price fixing took the form of bilateral agreements, allegedly coerced by unilateral action. Furthermore, the purpose of the Sherman Act is to promote competition and facilitate the workings of a

free market. Nothing in the complaint suggests that Columbia attempted to extort a below-market price through renegotiation. Indeed, the maximum lawful price allowable under the existing regulatory scheme was significantly in excess of the market price, given the tremendous oversupply stimulated by the enactment of the NGPA.

Accordingly, the court finds that the complaint does not allege facts sufficient to support a cause of action against Columbia under Section 1 of the Sherman Act.

### 2. Section 2 of the Sherman Act: Monopolization

Section 2 of the Sherman Act makes it unlawful to:

> monopolize or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several States or with foreign nations....

15 U.S.C. § 2. Plaintiffs contend that defendants' alleged conduct, as described above, constitutes a willful acquisition or maintenance of monopoly power. Because the factual allegations refer solely to Columbia, the court will consider the Section 2 monopolization claim as running only against Columbia and not against the producer defendants.

■ Columbia and its parent company, Columbia System, are regulated as monopolies under the Natural Gas Act, 15 U.S.C. § 717 *et seq.* Government regulation does not automatically exempt an industry from the ambit of the antitrust laws. *Woods Exploration and Pro. Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1302 (5th Cir.1971). Indeed, the Supreme Court has said that "immunity from antitrust laws 'is not lightly implied.'" *United States v. First City National Bank*, 386 U.S. 361, 368, 87 S.Ct. 1088, 1093, 18 L.Ed.2d 151 (1967), *quoting California v. FPC*, 369 U.S. 482, 485, 82 S.Ct. 901, 903, 8 L.Ed.2d 54 (1962).

■ To succeed under Section 2, a plaintiff must show that a regulated monopolist exercised power "to exclude competitors from ... trade or commerce among the several states...." *American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1946). *See also Mid-Texas Comm. Sys., Inc. v. AT & T,* 615 F.2d 1372, 1387 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980) (regulated monopoly liable under Section 2 only if exclusionary conduct towards competitors shown).

■ To state an adequate claim of monopolization under Section 2, plaintiffs must allege (1) possession of monopoly power in the relevant geographic and product market, and (2) willful acquisition or maintenance of that power as distinguished from a justifiable business decision. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Plaintiffs contend that the relevant market is the natural gas field and the relevant product is the available production of natural gas at the well site. For purposes of this motion to dismiss, the court finds that market description adequate. *Compare Woods Exploration, supra.*

■ The complaint also alleges intentional predatory conduct which constitutes "a refusal to deal in order to extend or abuse monopoly power." In particular, the complaint alleges that Columbia threatened Universal and other producers with future refusals to deal if they did not comply with Columbia's renegotiation demands. Absent the purpose or intent to create or maintain a monopoly, the courts will not "restrict the long recognized right of a trader or manufacturer engaged in an entirely private business freely to exercise his own independent judgment as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). However, Columbia's intentions are a question for the finder of fact. Accordingly, the court finds that the complaint alleges facts sufficient to state a cause of action under Section 2 of the Sherman Act.

### 3. *Standing*

#### a. *Section 4 of the Clayton Act*

██ Although the complaint's factual allegations are adequate to state a monopolization claim, plaintiffs are not the proper parties to maintain this antitrust action. Standing to bring a private antitrust action is conferred by Section 4 of the Clayton Act, which provides that "any person injured in his business or his property by reason of anything forbidden in the antitrust laws" may sue for treble damages. 15 U.S.C. § 15(a). Plaintiffs allege that they lost expected revenue as a result of Columbia's allegedly monopolistic practices. Despite the sweeping language of the statute, courts have not developed a strictly literal interpretation.

In articulating the requirements for standing, the Third Circuit has stated that courts must analyze such factors as "the causal connection between an antitrust violation and the injured party, the nature of the plaintiff's alleged injury, and the directness or indirectness of the asserted injury." *Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 964–65 (3d Cir.1983). Even if Columbia's alleged conduct did cause some injury to plaintiffs' business or property, plaintiffs nonetheless lack standing to sue because the alleged injury is too remote and does not result from an adverse impact of Columbia's conduct on competition. *Id., see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 484–89, 97 S.Ct. 690, 695–97, 50 L.Ed.2d 701 (1977).

In *Associated General Contractors, supra,* the Supreme Court held that a labor union had no standing to sue for injuries sustained as a result of an allegedly coerced boycott among general contractors of nonunion contractors and subcontractors because its injuries were too remote. 459 U.S. at 539–43, 103 S.Ct. at 909–911. The Court observed that certain contractors and subcontractors were the principal victims of any improper conspiracy, stating that:

> [if] either these firms, or the immediate victims of coercion by defendants, have been injured by an antitrust violation,

their injuries would be direct and … they would have a right to maintain their own treble damages actions against the defendants. An action on their behalf would encounter none of the conceptual difficulties that encumber the Union's claim. *The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party … to perform the office of a private attorney general.*

*Id.* at 541–42, 103 S.Ct. at 910–11 (emphasis added).

Here, Universal originally contracted to supply gas to Columbia. Plaintiffs were investors and their interest in the contracts arose by assignment. In addition, Universal itself renegotiated the contract. Universal was the immediate target and apparent victim of any actions by Columbia growing out of or relating to the price reduction. Any adverse impact on plaintiffs derived from whatever direct injury might have been suffered by Universal. Moreover, under the contract and assignment, Universal retains an identifiable and significant interest in the performance of the contract by Columbia and in the price paid for the gas. Additionally, the threats of future refusals to deal, if carried out, would have hurt Universal's business and reputation and would likely not have affected plaintiffs' interest in the present contracts. Certainly, Universal is part of that "identifiable class of persons whose self-interest would normally motivate them …" to sue for relief. *Id.*

██ In addition to showing that the injury to business or property is direct, a plaintiff must show that the injury allegedly suffered is of the type that "the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp., supra,* 429 U.S. at 489, 97 S.Ct. at 697.

The court does not believe that the injury allegedly suffered by plaintiffs is an anti-

trust injury in any sense of the term. Because Universal caved in to Columbia's alleged demands for a lower sale price, plaintiffs were deprived of the difference between what they expected to receive under the assigned contract and what they actually did receive. In essence, they suffered a loss because Universal breached the terms of the assignment agreement and renegotiated the contract without plaintiffs' knowledge or consent.

The antitrust laws were enacted to promote economic competition, not prohibit it. As the complaint itself makes clear, Columbia's conduct arose directly from a rapid and complex shift in market trends, complicated and to some extent caused by Government regulation. In other words, if the market price for natural gas had not plummeted after the NGPA stimulated exploration and production and Columbia arranged supply contracts to avert the severe shortages it experienced in the 1970's, Columbia would probably never have sought to extract a lower price from producers.

Plaintiffs made savvy investment decisions by financing drilling operations in the immediate wake of NGPA's enactment. Similarly, Universal and other producers found themselves on the right end of the deal once the market shifted. Columbia, however, made a serious error in estimating future supply and demand requirements when it entered into its numerous "take or pay" contracts in the early 1980's. When the market shifted, the deal soured and Columbia was saddled with billions of dollars of liabilities under the take or pay contracts. Its efforts to ameliorate that considerable liability may, as alleged, have violated the antitrust laws. But the probable victims of the allegedly predatory practices are the producers of natural gas who depend on Columbia's pipeline for transportation out of the gas field and on Columbia as a primary purchaser of natural gas, not the investors.

Plaintiffs would have an incentive to sue either Columbia or Universal or both to recover damages for the expected profits they never received regardless of how Columbia acted or why Universal decided to renegotiate. Once plaintiffs recover those damages, if indeed they are entitled to them, they will be made whole. They will not suffer in the future even if Columbia did or continues to violate the antitrust laws.

### b. *Section 16 of the Clayton Act: Injunctive Relief*

▆▆▆▆ Plaintiffs also lack standing to sue for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. The requirements for standing under Section 16 are "(1) a threatened loss or injury cognizable in equity that is (2) proximately caused by an alleged antitrust violation." *Nationwide Mutual Ins. Co. v. Automotive Serv. Council of Del., Inc.,* 490 F.Supp. 282, 284 (D.Del.1980). Plaintiffs meet neither of these requirements. First, plaintiffs' loss is not cognizable in equity. If they continue to be injured, as they allege, from an improper or ineffective renegotiation of the price of the gas, they have adequate legal remedies in other courts. Second, plaintiffs' alleged injury is not proximately caused by Columbia's conduct because there was an "independent factor"—Universal—which was capable of "rationally affect[ing] the amount of money flowing from plaintiffs to defendant...." *Id.* at 285. Therefore, as under Section 4, plaintiffs' injuries are too remote. *See Callahan v. Scott Paper Co.,* 541 F.Supp. 550, 561 n. 2 (E.D.Pa.1982) (denying injunctive relief and treble damages when alleged antitrust violation too remote).

### C. *The State Law Claims*

▆▆▆▆ The complaint states claims for breach of contract and civil conspiracy under state law. Because the court finds that plaintiffs lack standing to pursue their federal antitrust claims, the court cannot exercise its pendent jurisdiction over the state claims. Absent an independent jurisdictional basis, the court must dismiss the state law claims. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## IV. CONCLUSION

For all the foregoing reasons, the court will grant defendant Columbia's motion to dismiss the complaint pursuant to Fed.R. Civ.P. 12(b)(6). Since defendant U.S. Energy joined Columbia's motion, the complaint will also be dismissed against it. The court will also grant plaintiffs' motion to amend the complaint. An appropriate order will be entered.