824 F.2d 223
 1987-1 Trade Cases 67,626
 Daniel GARSHMAN and Donald Frank, as General Partners for
Tarbell I a Limited Partnership, et al., on their own behalf
and as representatives of all private persons and business
entities throughout the United States who are gas
producer/investors who have funded gas well exploration in
New York and Pennsylvania for resale to the pipeline
services of Columbia Gas Transmission Corporation
v.
UNIVERSAL RESOURCES HOLDING INC., a Pennsylvania
corporation, Berea Oil and Gas Corporation, a New York
Corporation, U.S. Energy Development Corporation, a New York
Corporation, Chautauqua Energy Inc., a New York Corporation,
Columbia Gas Transmission Corporation, a Delaware
Corporation, and the Columbia Gas System, Inc., a Delaware
Corporation.
Appeal of Daniel GARSHMAN and Donald Frank as general
partners for Tarbell I.
Appeal of UNIVERSAL RESOURCES HOLDING INC.
 Nos. 86-5647, 86-5648.
 United States Court of Appeals,
Third Circuit.
 Argued May 12, 1987.
Decided July 9, 1987.
 
 Stephen C. Rubino (argued), Valore, McAllister, Westmoreland, Gould, Vesper & Schwartz, Northfield, N.J., for Daniel Garshman and Donald Frank, et al.
 John E. Beerbower (argued), Robert N. Feltoon, John F. Kowal, Cravath, Swaine & Moore, New York City, for Columbia Gas Transmission Corp. and the Columbia Gas System, Inc.
 Michael M. Baylson (argued), Duane, Morris & Heckscher, Philadelphia, Pa., William Tomar, Lisa Rodriguez, Tomar, Seliger, Simonoff, Adourian & O'Brien, Haddonfield, N.J., for Universal Resources Holding, Inc.
 Before: GIBBONS, Chief Judge, MANSMANN, Circuit Judge, and KATZ, District Judge.*
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 Daniel Garshman and others, general partners in Tarbell I (Tarbell), a Pennsylvania limited partnership, which was formed to engage in oil and gas exploration, appeal from a Fed.R.Civ.P. 12(b)(6) order dismissing their complaint against Columbia Gas System, Inc. (System), a registered public utility holding company; its subsidiary, Columbia Gas Transmission Corporation (Transmission), owner of a gas pipeline; and Universal Resources Holding, Inc. (Universal), a producer of natural gas. Universal appeals from a Rule 12(b)(6) order dismissing its crossclaim against System and Transmission, and from the denial of its motion for a preliminary injunction. We will affirm.
 
 I.
 
 2
 This dispute arises out of the changes in the market for natural gas which occurred following the enactment of the Natural Gas Policy Act of 1978, Pub. L. No. 95-621, 92 Stat. 3350, when, as a result of deregulation, supplies of natural gas increased. According to the complaint and the crossclaim, the allegations of which we assume, for purposes of the appeals, to be true, System is a major factor in the natural gas market. System and its subsidiaries are in the business of exploration, production, purchase, transportation, storage and distribution of natural and synthetic gas. One of those subsidiaries, Transmission, owns and operates an interstate natural gas pipeline. Transmission buys natural gas from producers and transmits it for resale to customers, including local gas distribution companies which resell it to residential and commercial users. Prior to 1978, System was unable to secure enough natural gas to satisfy its customers' needs. When the Natural Gas Policy Act of 1978 encouraged exploration and drilling for natural gas, System undertook to secure gas supplies by entering into "take-or-pay" contracts with producers.
 
 
 3
 In the business of developing commercial deposits of natural gas in western New York and northwestern Pennsylvania, Universal provides the material and personnel required to drill gas wells and to deliver the gas to a pipeline for subsequent distribution. Universal funds its operations by obtaining leasehold interests for gas and by selling rights to the expected production from those leases to investors, who in turn pay Universal for exploration, for successful production, and make periodic payments to Universal based on the value of the gas produced over the life of the wells. Integrated natural gas companies like Transmission typically acquire thousands of acres of mineral leasehold interests and sublease them for production to producers like Universal.
 
 
 4
 In 1979, Universal acquired from Transmission the right to explore and drill on 12,699.70 acres in Chautauqua County, New York. Under that agreement, Universal was obliged to sell to Transmission all the natural gas it found. On November 23, 1981 Transmission agreed to buy, and Universal agreed to produce and sell, all natural gas produced by wells on a part of the Chautauqua County acreage. Under this "take-or-pay" contract, Transmission was obligated to take from Universal or to pay for, if available but not taken, at least 75% of the wells' estimated yearly output of gas. Quantities of gas paid for, but not taken, would be available for delivery to Transmission in the future as "make-up gas." The contract price was "the maximum lawful price applicable" under federal statutory and regulatory authority. The contract authorized Transmission to "restrict the flow or discontinue the taking of gas temporarily, when and for such length of time as in its judgment it is deemed expedient so to do, [Transmission's] judgment being based upon consideration of market demand, its then existing pipeline facilities, the line pressure it deems necessary to maintain, and the competitive and other conditions in the various fields in which it is purchasing or producing gas." This right to restrict flow, however, did not operate to diminish Transmission's obligation to take-or-pay for 75% of the wells' estimated yearly output.
 
 
 5
 In order to complete the wells, Universal entered into a turnkey contract with Tarbell to drill wells. Tarbell advanced certain payments and received an assignment of certain of Universal's rights under the November 23, 1981 "take-or-pay" contract.
 
 
 6
 Drilling and production commenced in 1983. By then, however, the market for natural gas had changed significantly. As a result of the fall in oil prices and energy conservation efforts, demand for natural gas declined. At the same time, exploration and development stimulated by the Natural Gas Policy Act increased the availability of natural gas. Thus, System and Transmission found themselves contractually obligated to Universal and to many other producers to pay for far more gas than they could resell, and to pay those producers prices greater than the price which their customers would pay for gas. The liability of System and Transmission to pay for gas not taken in 1983 approached $3 billion.
 
 
 7
 Consequently, in 1983 Transmission sought to renegotiate the price provisions in its "take-or-pay" contracts with Universal and other producers. Transmission threatened that, if price concessions were not forthcoming, it would: a) reduce Universal's ability to sell gas; b) refuse to enter into future arrangements with Universal for exploration and development of other reserves Transmission owned; c) arbitrarily manipulate pipeline pressure to reduce the flow of gas from Universal's wells; and d) make drastic cuts in the natural gas production. Transmission refused to authorize Universal to sell its gas to other pipelines. Transmission discriminatorily granted favored pipeline access to those producers who did agree to modify the price clauses of their "take-or-pay" contracts. On August 29, 1984, as a result of Transmission's pressure, Universal, as did other producers, agreed to a new price provision with Transmission, effective July, 1983. The effect of the price change was to reduce both for Universal and for Tarbell the return from the wells.
 
 II.
 
 8
 Tarbell reacted to the modified contracts by suing System, Transmission, Universal, and three other natural gas producers-Berea Oil and Gas Corp., U.S. Energy Development Corp. and Chautauqua Energy Inc. Tarbell purported to act on behalf of a class comprised of persons and businesses in the United States who funded gas well exploration in New York and Pennsylvania for resale to Transmission. The complaint alleged federal antitrust violations and pendent state law contract and tort claims.
 
 
 9
 Universal answered and filed a crossclaim against Transmission and System. In the crossclaim, Universal purported to act on behalf of a class comprised of gas producers operating within the geographic area served by Transmission's pipeline who have had "take-or-pay" contracts with Transmission any time since 1979. The crossclaim alleged essentially the same antitrust and state law claims as did the Tarbell complaint. Universal's answer admitted most of Tarbell's allegations, but raised duress and lack or failure of consideration as defenses.
 
 
 10
 System and Transmission moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the Tarbell complaint for failure to state a claim on which relief could be granted. System also moved for a dismissal for lack of personal jurisdiction and improper venue. When Tarbell then sought leave to file an amended complaint, these motions were deferred. After Tarbell's amended complaint and Universal's amended answer and crossclaim were filed, the System and Transmission motions against Tarbell were renewed. System and Transmission also moved to dismiss Universal's crossclaim. Universal moved for a preliminary injunction compelling Transmission to enter into new contracts without certain language to which Universal objected. An evidentiary hearing on the preliminary injunction motion was held on December 9, 1985.
 
 
 11
 The district court ruled separately on the Tarbell complaint and the Universal crossclaim. On January 3, 1986 the court held: (1) that Tarbell's complaint did not state a price-fixing claim in violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1982); (2) that Tarbell's complaint did state a claim of monopolization in violation of section 2 of the Sherman Act, 15 U.S.C. Sec. 2 (1982); but (3) that Tarbell lacked standing either under section 4 or section 16 of the Clayton Act, 15 U.S.C. Secs. 15, 26 (1982) to press such a claim. Since the only basis for federal jurisdiction fell for lack of standing, the court dismissed without prejudice the pendent state law claims. See Garshman v. Universal Resources Holding, Inc., 625 F.Supp. 737 (D.N.J.1986) (Garshman I).
 
 
 12
 On August 18, 1986 the district court dismissed Universal's antitrust and state law claims. The claims against System were dismissed for improper venue. Those against Transmission, both federal and state, were dismissed for failure to state a claim upon which relief could be granted. Universal's motion for a preliminary injunction was denied as moot. Garshman v. Universal Resources Holding, Inc., 641 F. Supp. 1359 (D.N.J.1986)(Garshman II). These rulings left undisposed only Tarbell's claims against Universal and the other producer/defendants. Claims against Universal and two other producer/defendants, Berea Oil and Gas Corp. and Chautauqua Energy Inc., were dismissed by stipulation. Another, against U.S. Energy Development Corp., was dismissed in Garshman I. Thus, all claims against all parties have been ruled upon. See Fed.R.Civ.P. 54(b). Tarbell and Universal appeal.
 
 III.
 
 13
 As the pleadings make plain, Tarbell's rights are derivative of the rights of Universal. Arguably, Tarbell might have suffered damages different from those suffered by Universal because Universal contracted away some, but not all, of its rights under the "take-or-pay" contract with Transmission. If Transmission and System have incurred no liability to Universal, either under the antitrust laws or as a matter of state law, however, there is no separate basis for holding them liable to Tarbell. Thus, it is appropriate to consider first whether the pleaded facts, if proved, could result in liability to Universal.
 
 A.
 Section 2 of the Sherman Act Claim
 
 14
 In Count I of its crossclaim, Universal alleges that System and Transmission "possessed monopoly power in the purchase and interstate transportation of natural gas within the relevant geographical market." That market, Universal alleges, "coincides with the interstate pipeline system of defendant Transmission, which is the Middle Atlantic Region, the states of Ohio and West Virginia and including the northern part of Virginia and northeastern parts of Kentucky." Having monopoly power in that market, Universal charges:
 
 
 15
 a. Transmission has unlawfully maintained its monopoly power to fix, stabilize or set the price of natural gas in interstate commerce;
 
 
 16
 b. Transmission has denied Universal [and others] equal access to and in some situations [has] foreclosed them from access to the pipeline network in order to enhance their ability to secure price concessions from producers;
 
 
 17
 c. Transmission and [System] have used their economic power in the industry arbitrarily to breach existing contracts in order [to] reduce their take or pay liability to producers of natural gas;
 
 
 18
 d. [System] and Transmission have engaged in predatory actions and so-called "re-negotiations," all with the purpose of unlawfully reducing their take or pay liability throughout the country;
 
 
 19
 e. Transmission and [System] have conditioned the purchase of natural gas from natural gas producers upon price concession agreements that were extorted from Universal and other producers;
 
 
 20
 f. Transmission and [System] have unlawfully utilized their market power as one of the largest vertically integrated gas producers in the United States to unfairly coerce Universal and members of the class to sell natural gas at prices lower than those contracted for, the effect being to coerce and intimidate producers into acquiescing to price cuts in order to secure access for their gas to the pipeline of Transmission;
 
 
 21
 g. Transmission and [System] refused to take, pay or authorize the release for sale to their competitors the gas which was or could have been produced by Universal and the other members of the class which allowed Transmission and [System] to preserve and perpetuate their monopoly position with respect to the supply of gas still in the ground which they have under contract for future purchase;
 
 
 22
 h. During 1983 and 1984, Transmission continued to enter into gas purchase contracts obligating it to pay a price it had already refused to pay to producers on pre-existing contracts and which was in excess of the market price, thus preventing its competitors from gaining access to it unless they were willing to contract to pay in excess of the market price.
 
 
 23
 The injury alleged by Universal is that it and similarly situated producers "were unable to meet contractual agreements between various limited partnerships for natural gas developed at their well sites; they were required to purchase various mechanical devices to try and compete with the back pressuring manipulations of Transmission and [System] in order to get their gas into the pipeline, and they were thereby forced to make expenditures that otherwise would have been unnecessary to make; and their good will and their competitive positions among other gas producers in relation to the natural gas investment community were injured by their inability to maintain their contractual agreements and expected investment returns for natural gas produced." Additionally, Universal claims that it was coerced into compliance with Transmission's demand for price concessions on its "take-or-pay" contract.
 
 
 24
 The district court concluded that no set of facts which Universal could hope to prove under the quoted pleading would establish a violation of section 2 of the Sherman Act. Universal could prove that System and Transmission had extensive holdings of potential exploration sites for natural gas. It is not alleged, however, that they had, or exercised, monopoly power in the acquisition of those holdings. Universal could prove that System and Transmission leased those holdings to natural gas producers on terms which required the producers to sell gas exclusively to them. It is not alleged, however, that, in offering exploration rights on such terms they had, or exercised, monopoly power. Universal does not allege, for example, that by acquiring extensive natural gas leasehold rights, System and Transmission have been able to fix prices or to exclude competition in the natural gas drilling business. Rather, the most that Universal could attempt to prove is that, faced with a constricting market and falling resale prices for natural gas, System and Transmission reacted by demanding successfully price concessions from their suppliers.
 
 
 25
 Universal could also attempt to prove that the success of System's and Transmission's demands resulted from a) their contractual right to demand that gas producers in fields which System and Transmission own sell only to them; b) System's and Transmission's contractual right to control the volume of gas moving through their pipeline; and c) their ability to exclude producers like Universal from exploration in other gas fields that System and Transmission owned. Universal does not plead that, had it simply stood pat, Transmission could have avoided making payment for 75% of the estimated annual production of each well. Monopolization, if it occurred, did not arise by virtue of Transmission's power to manipulate pipeline volume in accordance with the terms of the take-or-pay contracts. The contracts still provided for minimum annual payments. Monopolization arose, if at all, solely out of System's and Transmission's ownership of the underlying leasehold rights. It is that ownership which permitted Transmission to demand that gas be sold only to it. It is that ownership which permitted Transmission to threaten to exclude from future exploration those producers unwilling to renegotiate. Thus, the monopolization claim depends ultimately on whether, as a matter of law, the acquisition of the underlying leaseholds violated section 2 of the Sherman Act.
 
 
 26
 Universal does not make that claim. Indeed, such a claim would be inconsistent with the main thrust of its crossclaim. Universal defines the product market as the purchase and transportation of natural gas through interstate pipelines. If the owernship of the underlying leaseholds, which is the source of whatever leverage Transmission holds, amounted to monopoly power in that product market, Transmission would not have been faced with competition from other fuel producers, new gas producers, and consumer resistance in 1983. The very allegations of the crossclaim, that these factors prompted Transmission's price-reduction coercion, therefore, belie Universal's concluding allegation that Transmission was exercising monopoly power. There is no contention that System and Transmission owned such a proportion of the underlying leaseholds for natural gas that they were in any position to prevent the exploration and the production of new gas. Indeed, fairly read, the crossclaim alleges just the opposite. A violation of section 2 requires acquisition of the power to exclude competitors from a relevant market. American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1946); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226 n. 59, 60 S.Ct. 811, 845 n. 59, 84 L.Ed. 1129 (1940). We agree with the district court that the allegations in the crossclaim fall far short of this and do not state a claim for violation of section 2.
 
 
 27
 Universal maintains that the decisions in Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) and Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) require a different conclusion. In Otter Tail Power, the Court held that an owner of electric transmission lines who refused to permit competitors in power generation to "wheel" power over its transmission lines to remote customers had violated section 2. In Aspen Skiing, three Aspen, Colorado ski lift facilities were held to have violated section 2 by refusing to include a small competitor in a package ticket arrangement. See also Woods Exploration & Producing Co. v. Aluminum Co. of America, 438 F.2d 1286 (5th Cir.1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) (owners of gas wells claimed that other producers violated antitrust laws by refusing to deal with them); MCI Communications Corp. v. A.T. & T. Co., 708 F.2d 1081 (7th Cir.), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (A.T. & T. unlawfully refused to interconnect a long distance competitor with A.T. & T.'s local telephone network). This line of cases lends no assistance to Universal. In all of these cases, the holder of an essential facility refused to permit access to it by a competitor, thereby injuring competition. Universal is not a competitor of System or Transmission. It is a customer for exploration rights in mineral leaseholds which System and Transmission own. The coercion of which Universal complains was effective because others engaged in the natural gas exploration business were available to compete with Universal for exploration rights to System's and Transmission's leaseholds. The result of Transmission's coercion was a reduction in the price Transmission had to pay Universal for extraction and delivery of gas, and a concomitant reduction in the price at which Transmission could offer gas for resale. All these effects are pro-competitive, not anticompetitive.
 
 B.
 Section 1 of the Sherman Act Claim
 
 28
 Count II of Universal's crossclaim asserts a violation of section 1 of the Sherman Act. Universal alleges that System and Transmission "have entered into one or more agreements, contracts or conspiracies, and have engaged in concerted action with other entities, which agreements are in restraint of trade and are unreasonable, to achieve the anti-competitive and unlawful actions and effects as alleged in this crossclaim." Except for the renegotiated price contracts which are specifically referred to elsewhere in the crossclaim, this allegation does not identify either the "contracts," the "other entities," or the "anti-competitive and unlawful actions and effects." Clearly, Universal cannot base its claim on any conspiracy between System and its subsidiary, Transmission. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 777, 104 S.Ct. 2731, 2744, 81 L.Ed.2d 628 (1984). The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act. See Black & Yates, Inc. v. Mahogany Ass'n, 129 F.2d 227, 231-32 (3d Cir.), cert. denied, 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539 (1942); Kalmanovitz v. G. Heileman Brewing Co., 595 F.Supp. 1385, 1400 (D.Del.1984), aff'd, 769 F.2d 152 (3d Cir.1985).
 
 
 29
 The specific agreements which Universal does identify as contracts in unlawful restraints of trade are those containing the renegotiated "take or pay" price for natural gas. Universal alleges:
 
 
 30
 The negotiated contracts and agreements imposed by [System] and Transmission are without economic merit, are the results of coercion and duress and were entered into by Universal and other members of the class as the only alternative to being forced out of business as a result of the threats and actions of [System] and Transmission as alleged herein.
 
 
 31
 The threats and actions to which Universal refers are, of course, the same threats and actions relied on in Universal's section 2 claim.
 
 
 32
 Universal claims that its Count II pleads a per se violation of section 1 because the coerced renegotiated agreements fixed the price of natural gas. This court has held, however, that "[t]he price-fixing within the scope of the per se prohibition of Sec. 1 ... is an agreement to fix the price to be charged in transactions with third parties, not between contracting parties themselves." Sitkin Smelting & Refining Co. v. FMC Corp., 575 F.2d 440, 446 (3d Cir.), cert. denied, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978).
 
 
 33
 Alternatively, Universal contends that its pleading sufficed to permit it to attempt to prove a rule of reason violation on the theory that it was a reluctant participant in the conspiracy. See Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 141-42, 88 S.Ct. 1981, 1985-86, 20 L.Ed.2d 982 (1968) (plaintiff may allege illegal combination between defendant and itself); see also Albrecht v. Herald Co., 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 872 n. 6, 19 L.Ed.2d 998 (1968)(same). What is still missing, however, is any allegation of an adverse effect upon competition. It is not alleged that, by reducing the prices paid to Universal for extracting natural gas from its leaseholds, Transmission raised gas prices to its customers. It is not alleged that, by reducing the price paid to Universal for extracting natural gas from its leaseholds, Transmission affected the price of gas produced on leaseholds owned by others. It is not alleged that, by reducing the prices paid to Universal for extracting natural gas from its leaseholds, Transmission affected the price at which others in the business of exploration would undertake that service. Thus, no facts are alleged which suggest either a horizontal or a vertical effect upon competition in the purchase or sale of natural gas or in the purchase or sale of exploration services.
 
 
 34
 Universal's per se claim is untenable. Universal's allegations suggest no adverse effect on competition in any relevant market. Thus, the district court did not err in holding that Universal's complaint fails to state a per se or a rule of reason violation of section 1 of the Sherman Act.
 
 C
 State Law Claims
 
 35
 Universal's crossclaim also pleads state law claims for breach of contract, tortious interference and duress, and requests a declaratory judgment that the term of the "take-or-pay" contract be extended because of Transmission's wrongful conduct. Universal also seeks indemnification against Tarbell's claims. The declaratory judgment and indemnification claims depend upon the allegations of breach of contract, tortious interference or duress. Thus, we need not separately consider them.
 
 
 36
 In contrast with the disposition of Tarbell's pendent state law claims, which were dismissed without prejudice, Garshman I, 625 F.Supp. at 746, the district court addressed the merits of Universal's state law claims, Garshman II, 641 F.Supp. at 1371-72. The district court was correct in doing so because the Rule 12(b)(6) dismissal of Universal's antitrust claims was on the merits. See Fairview Park Excavating Co. v. Al Monzo Construction Co., 560 F.2d 1122, 1125 (3d Cir.1977); Hubicki v. ACF Indus., Inc., 484 F.2d 519, 523 (3d Cir.1973); cf. Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir.1976) (dismissal of federal law claims for lack of standing requires dismissal of pendent state law claims). Thus we, too, address the merits of Universal's state law claims.
 
 
 37
 The district court, applying New Jersey's choice-of-law rules, concluded that New York law applies to Universal's state law claims. The parties do not dispute the application of New York law.
 
 1. Breach of Contract
 
 38
 In Count III of its crossclaim, Universal alleges that System and Transmission failed "to pay the maximum lawful price for natural gas under the contracts and to take the volume of gas required by such contracts." The reference is to the original "take-or-pay" contracts. The same pleading, however, alleges that those contracts were renegotiated. The district court noted that, while the quoted language alleged a breach of contract, the contracts in question could not be relied on unless the renegotiated contracts could first be set aside. Thus, the court concluded, the breach of contract claim was rooted in the claim of duress. See Garshman II, 641 F.Supp. at 1372. We agree that, unless Universal has grounds for setting aside the allegedly coerced renegotiated contract which it executed, it cannot rely upon the original contract.
 
 2. Coercion and Duress
 
 39
 In Count VI of its crossclaim, Universal alleges that "[t]he acts and conduct of [System] and Transmission constitute duress and coercion of Universal and members of the class." Under New York law, a claim for duress requires four elements: (1) a threat; (2) unlawfully made; (3) that caused involuntary acceptance of contract terms; (4) because the circumstances permitted no alternative. See Gulf & Western Corp. v. Craftique Productions, Inc., 523 F.Supp. 603, 610 (S.D.N.Y.1981); Business Incentives Co. v. Sony Corp. of America, 397 F.Supp. 63, 69-70 (S.D.N.Y.1975); see also Austin Instrument, Inc. v. Loral Corp., 29 N.Y.2d 124, 130-31, 272 N.E.2d 533, 535, 324 N.Y.S.2d 22, 25-26 (1971). The district court held that Universal's crossclaim did not plead the required elements. To establish that circumstances permitted no alternative except acceptance of a revised contract, the party claiming duress must show "that the ordinary remedy of an action for breach of contract would not be adequate." Id.; see also Neuman v. Pike, 591 F.2d 191, 194 (2d Cir.1979); Hotel Constructors, Inc. v. Seagrave Corp., 574 F.Supp. 384, 391 (S.D.N.Y.1983); Union State Bank v. Weaver, 526 F.Supp. 29, 34 (S.D.N.Y.1981); National American Corp. v. Federal Republic of Nigeria, 448 F.Supp. 622, 644-45 (S.D.N.Y.1978), aff'd, 597 F.2d 314, 323 (2d Cir.1979).
 
 
 40
 Universal's crossclaim does not allege that, when Universal breached, or threatened breach, of the original "take-or-pay" contract, an action for breach of contract was impossible or inadequate. This pleading failure alone suffices to affirm the district court's holding that the crossclaim fails to state a claim for duress under New York law. Transmission also contends that the district court's decision is supported by the New York rule that an announced intention to exercise a legal right is not a threat. See Printers II, Inc. v. Professionals Publishing, Inc., 615 F.Supp. 767, 772 (S.D.N.Y.1985), aff'd, 784 F.2d 141 (2d Cir.1986). We do not rely on this ground, however, because read in a manner most favorable to Universal, the crossclaim would permit proof that Transmission actually breached the original contract prior to its renegotiation. Universal's pleading is nevertheless inadequate because it fails to allege facts suggesting why, if such a breach occurred, a legal remedy for the breach could not have been pursued.
 
 3. Tortious Interference
 
 41
 Count VI of Universal's crossclaim alleges that "the acts and conduct of [System] and Transmission ... constitute tortious interference with contract rights and tortious interference with prospective economic advantage of Universal and the members of the class." New York law recognizes the tort of tortious interference with contractual relations. E.g., Nordic Bank PLC v. Trend Group Ltd., 619 F.Supp. 542, 560-61 (S.D.N.Y.1985); Beacon Syracuse Associates v. City of Syracuse, 560 F.Supp. 188, 201 (N.D.N.Y.1983). New York law probably also recognizes the tort of tortious interference with prospective economic advantage. See Burns Jackson Miller Summit & Spitzer v. Lindner, 88 A.D.2d 50, 72, 452 N.Y.S.2d 80, 93 (2d Dep't 1982) (citing Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 406 N.E.2d 445, 428 N.Y.S.2d 628 (1980)), aff'd, 59 N.Y.2d 314, 451 N.E.2d 459, 464 N.Y.S.2d 712 (1983).
 
 
 42
 In New York, there are four elements to a cause of action for tortious interference with contractual relations: 1) a valid contract between the plaintiff and a third party; 2) defendant's knowledge of that contract; 3) defendant's intentional procurement of a breach of that contract; and 4) damages caused by the breach. See Israel v. Wood Dolson Co., 1 N.Y.2d 116, 120, 134 N.E.2d 97, 99, 151 N.Y.S.2d 1, 5 (1956); Bryce v. Wilde, 39 A.D.2d 291, 293, 333 N.Y.S.2d 614, 616 (3d Dep't), aff'd, 31 N.Y.2d 882, 292 N.E.2d 320, 340 N.Y.S.2d 185 (1972). The four elements are conjunctive and all four must be pleaded. See, e.g., Burns Jackson, 88 A.D. 2d at 72, 452 N.Y.S.2d at 93.
 
 
 43
 The only contracts specifically identified in Universal's crossclaim are the "take-or-pay" contracts between Transmission and Universal and other producers. As the district court correctly noted, under New York law, a party cannot be liable in tort for inducing the breach of its own contract. See Garshman II, 641 F.Supp. at 1374 (quoting Robbins v. Ogden Corp., 490 F.Supp. 801, 810 (S.D.N.Y.1980)). Universal contends, however, that fairly read the crossclaim alleges tortious interference with its contractual relations with Tarbell and other investors. Although these contracts are mentioned generally, the crossclaim does not allege that Transmission knew of them or intentionally procured their breach. Thus, the district court properly dismissed Universal's claim for tortious interference with contract rights for failure to plead all the elements of that tort.
 
 
 44
 It is unclear from Universal's brief whether Universal also challenges the district court's dismissal of its claim for interference with prospective economic advantage. Assuming that it does, we note that nowhere in the crossclaim does Universal allege what prospective economic advantage would have materialized but for Transmission's actions. There is no allegation that Transmission knew of any prospective contract between Universal and another entity, that Transmission intended to interfere with it, or that such a prospective contract even existed. New York law requires that the prospective contractual relationship be identified and that the alleged tortfeasor have knowledge of it. See Burns Jackson, 88 A.2d at 72, 452 N.Y.S.2d at 93. The district court, therefore, properly dismissed Universal's claim of tortious interference with prospective economic advantage for failure to plead all the elements of that tort.
 
 D.
 Leave to Amend
 
 45
 Universal argues here that, even if the allegations in its crossclaim lacked sufficient specificity to survive a Fed.R.Civ.P.12(b)(6) motion, the crossclaim should not have been dismissed without affording Universal an opportunity to amend. No motion for leave to amend was made in the district court. The absence of such a motion is, perhaps, not fatal to Universal's contention. See District Council 47 v. Bradley, 795 F.2d 310, 317 (3d Cir.1986). Even here, however, Universal does not state what additional facts it would allege in an amended crossclaim. The theories on which it relies, under sections 1 and 2 of the Sherman Act and under New York law, have been fully developed and are legally inadequate. A remand to the trial court to consider a motion for leave to amend, therefore, would serve no useful purpose.
 
 E.
 Venue over System
 
 46
 The district court dismissed Universal's crossclaim against System for improper venue. As the discussion above indicates, we will affirm the dismissal of the crossclaim against System's subsidiary, Transmission on the merits. Obviously, then, nothing of consequence turns on the venue ruling at this point. Even if the dismissal of the crossclaim against System were for lack of venue rather than on the merits, System would be able, once the judgment in this case became final, to assert it defensively, as a matter of collateral estoppel, against Universal. Thus, there is no need to address Universal's contention that the venue ruling was erroneous.
 
 IV.
 
 47
 We noted at the beginning of Part III above that Tarbell's claims are entirely derivative of Universal's. Tarbell's only relationship to System and Transmission is by virtue of an assignment of some interest in the "take-or-pay" contract between Transmission and Universal. Tarbell challenges the district court's ruling that it lacks standing under sections 4 and 12 of the Clayton Act to pursue its antitrust claims. We do not rely upon, and need not reach, this ground of the decision below. If the complaint fails to allege violations of the underlying substantive prohibitions--in this case sections 1 and 2 of the Sherman Act--standing under sections 4 and 12 of the Clayton Act is irrelevant. Assuming that Tarbell sufficiently alleged the requisite past or prospective injury to its business or property, it still had to allege a violation of the antitrust laws. We have carefully examined Tarbell's amended complaint to determine whether it adds anything to the allegations in Universal's crossclaim. It does not. Indeed, the crossclaim merely restates the antitrust allegations of the complaint. Both of Universal's antitrust claims were properly dismissed for failure to state a claim upon which relief could be granted. Thus, we conclude that Tarbell's complaint also failed to state a claim in violation of section 1 or 2 of the Sherman Act. Moreover, the district court did not abuse its discretion in dismissing Tarbell's pendent state law claims when the federal law claims on which subject matter jurisdiction depended were dismissed. See United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).
 
 V.
 
 48
 The district court did not err in dismissing Universal's crossclaim for failure to state a claim under the federal antitrust laws or under New York State law. Nor did the court err in dismissing Tarbell's antitrust complaint for failure to state a claim under the federal antitrust laws and in dismissing Tarbell's pendent state law claims because the federal law claims were dismissed. Furthermore, the district court did not err in denying as moot Universal's motion for a preliminary injunction. The orders appealed from will therefore be affirmed in all respects.
 
 
 
 *
 Hon. Marvin Katz, United States District Judge for the Eastern District of Pennsylvania, sitting by designation